IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

MARYETTA M. BECK,

 Plaintiff,

  v.        CV 113-126

ERIC K. SHINSEKI, Secretary,
Department of Veterans Affairs,

 Defendant.

---

**O R D E R**

---

 Maryetta M. Beck appeals the decision of the Disciplinary Appeals Board ("the Board" or "DAB"), affirmed by the Principal Deputy Under Secretary for Health ("Under Secretary"), to discharge her from her position as a registered nurse at the Charlie Norwood Veterans Administration Medical Center ("VAMC") in Augusta, Georgia. The parties have fully briefed and filed cross-motions for summary judgment on the propriety of the Board's termination decision. Upon review of the administrative record,[1] the Court **AFFIRMS** the decision of the DAB and **GRANTS** Defendant's motion for summary judgment. (Doc. 32.) Ms. Beck's

---

[1] The administrative record — totaling more than 1,200 pages — consists of five main categories, which will be cited as follows: DAB Evidence File ("DAB R."), Doc. 37-1; DAB Hearing Transcript ("DAB Tr."), Docs. 23-1 ("Vol. 1"), 23-2 ("Vol. 2"), 23-3 ("Vol. 3"); CPRS Medical Records ("CPRS Med. R."), Doc. 24; Bar Code Medication Administration History ("BCMA"), Docs. 25-1 ("Vol. 1"), 25-2 ("Vol. 2"); and Flowsheets, Docs. 27-1 through 27-9.

motion for summary judgment, therefore, is **DENIED** (doc. 30), and Defendant's motion to strike (doc. 35) is **DENIED AS MOOT**.

## I. BACKGROUND

Plaintiff Maryetta M. Beck is an Idaho- and Georgia-licensed registered nurse ("RN") who was hired by the Department of Veterans Affairs pursuant to 38 U.S.C. § 7401(1) and worked as a full-time permanent nurse in the Critical Care Unit ("CCU") at Charlie Norwood Veterans Administration Medical Center ("VAMC") in Augusta, Georgia. (DAB Tr. Vol. 1 at 28, 34, 201.) Ms. Beck began her employment at the VAMC in 2004 but has practiced as an RN since 1985. (Id. at 23-24.) In 1985, Ms. Beck also joined the military. (Id. at 25.) While on active duty in the United States Army and later in her career with the Reserves, Ms. Beck worked at several hospitals in a critical care capacity. (Id. at 26-29.) She earned a military designation or certification for this practice area. (Id. at 33.) In her seven years at the VAMC, Ms. Beck's performance was regarded as "at least fully successful or better." (DAB R. at 89.) She had never been disciplined or reprimanded in any way during her long career with the VAMC or through multiple commands and tours in the Army. (Id. at 9, 89.)

On September 12, 2008, the CCU assigned Ms. Beck to cover "Patient C," whom she cared for until his death on September 15, 2008. (Id. at 37-39.) During this four-day period, she worked

2

the twelve-hour day shift that begins at 7:00 AM. (Id. at 37.) Patient C was critically ill when he entered the hospital and he deteriorated quickly. (DAB Tr. Vol. 2 at 73.) His case was complicated by multiple comorbidities, including kidney dysfunction, a collapsed lung, altered mentation, severely compromised nutrition, and HIV/AIDS. (Id.) The VAMC ultimately transferred Patient C to the CCU because of issues maintaining his oxygenation and blood pressure. (Id. at 73-74.) After being intubated, Patient C suffered cardiac or respiratory arrest. (DAB R. at 190.) After this arrest, a chest tube was inserted and Patient C's blood pressure and pulse "normalized," but he remained sedated, restrained, and required mechanical ventilation. (Id.; see also CPRS Med. R. at 61, 63-64 80-82.)

## A.   Administration of Vasopressors

In addition to Ms. Beck, two doctors primarily managed Patient C's care during the relevant period, Dr. Kalla and Dr. Degani. (DAB R. at 111-14; DAB Tr. Vol. 1 at 45.) Deciding that Patient C was hypotensive, on September 12, 2008 the doctors prescribed a course of intravenous "pressors" or "vasoconstrictors" — in this case, Levophed and Vasopressin — to support his blood pressure. (DAB Tr. Vol. 1 at 66-71; DAB Tr. Vol. 2 at 74-77; CPRS Med. R. at 65 (noting initiation of Vasopressin at 13:45), 74 (noting the discontinuation of

Dopamine and initiation of Levophed).)  An order to titrate[2] the drugs to maintain the Mean Arterial Pressure ("MAP")[3] above 65 accompanied the prescription.  (CPRS Med. R. at 65, 69, 70, 72, 74.)  During the afternoon of September 12, Dr. Degani and Dr. Prosser visited with the family in light of Patient C's deteriorating condition to develop a plan of care and discuss a Do Not Resuscitate ("DNR") order.  (Id. at 47.)  The family agreed "to the current plan to treat but request[ed] a [DNR] status."  (Id.)  In other words, the family did not want CPR to be administered if Patient C coded, but they did wish "to continue what [the VMAC] was currently doing" so that certain family members who did not live nearby could visit him.  (Id. at 48; DAB Tr. Vol. 2 at 79.)  A full DNR appeared in Patient C's hard chart that same day.  (DAB Tr. Vol. 1 at 95-96.)

The following morning, on September 13, Ms. Beck learned that there was to be "no escalation of care" (id. at 79, 85), and she made a record of that in her progress notes (CPRS Med.

---

[2]    Titration is the process in which a physician first establishes a desired effect or standard — here, maintenance of MAP at 65 or greater — and the dosage of medication is then moved up or down to achieve that effect, often with the goal of using as little of a drug as necessary.  (DAB Tr. Vol. 1 at 65; DAB Tr. Vol. 2 at 76; DAB Tr. Vol. 3 at 32-33.)  Generally, with respect to pressors, Levophed is the "first line of defense."  (DAB Tr. Vol. 2 at 74-75.)  If a patient's blood pressure does not respond to the Levophed, Vasopressin may be added to help.  (Id.; DAB Tr. Vol. 3 at 32-33.)  If a combination of the two drugs is effective such that the patient's blood pressure responds, a doctor typically will order that the Vasopressin be weaned to off and the Levophed be titrated down to the lowest level possible.  (DAB Tr. Vol. 2 at 76-77; DAB Tr. Vol. 3 at 32-33.)

[3]    MAP is calculated pursuant to a formula with a patient's systolic, diastolic, and pulse pressures as inputs.  It describes an average blood pressure in an individual.

4

R. at 42). Indeed, Dr. Prosser's own progress note stated, "[F]amily desires no escalation of care — will maintain current dose of pressors but not increase." (Id. at 38.) Shortly thereafter, Ms. Beck received a verbal order from Dr. Degani to "wean" the Vasopressin off, but to continue titrating the Levophed.[4] (DAB Tr. Vol. 1 at 79-81.) Accordingly, Ms. Beck titrated the Vasopressin off during her shift.[5] (Id. at 111-12.) Dr. Degani, however, did not follow up with a written order, and Ms. Beck did not follow up with Dr. Degani or Dr. Kalla to sign any order as to the discontinuation of Vasopressin. (Id. at 80.) Although doctors issued verbal orders from time to time at the VAMC, management had instructed the nurses not to accept them unless it was during an emergency because the doctors often failed to sign the corresponding written version in a timely manner or at all, thereby leaving a significant gap in the patient's records. (DAB Tr. Vol. 1 at 107-08; DAB Tr. Vol. 3 at 33-34.) In the absence of such a notation by Dr. Degani or Dr. Kalla, Patient C's night shift nurse, RN Melanie Ellis, resumed administration of the Vasopressin. (DAB Tr. Vol. 2 at 21, 25.)

---

[4]     The Court is unable to reconcile the discrepancies in the record as to the administration of Vasopressin. Ms. Beck's testimony states that Dr. Degani issued the verbal order to wean the Vasopressin off on September 13, the morning after meeting with Patient C's family. (DAB Tr. Vol. 1 at 79-81.)     Patient C's progress notes indicate that Ms. Beck discontinued the Vasopressin at 16:15 on September 12, which would have been before the family's DNR and "do not escalate" orders issued. (CPRS Med. R. at 65.)

[5]     Unlike Levophed, which requires adjusting the rates of infusion via titration, Vasopressin is administered at a constant rate. (DAB Tr. Vol. 2 at 12, 76, 77.) Thus, Vasopressin is "either on or it's off." (Id. at 76.)

Notwithstanding the lapse in Patient C's records as to the Vasopressin, Ms. Beck continued to administer the Levophed during her shifts on September 13 and September 14. (CPRS Med R. at 27, 41; see also Flowsheets 3, 17, 19.) Ms. Beck also increased Patient C's pain and sedative medications – Versed and Fentanyl – over the same period, in marked contrast to the levels administered by RN Ellis. (DAB Tr. Vol. 1 at 185-86; DAB Tr. Vol. 2 at 29-31; Flowsheets 3, 19.)

By the early morning on September 15, Patient C's MAP had fallen into the twenties. (CPRS Med. R. at 23; Flowsheets 10, 11.) Ms. Beck further noticed a considerable change in Patient C's appearance upon her arrival that day. In particular, his skin was muddled; he did not appear to be breathing over the ventilator; she could not feel any pulses even with a Doppler probe; Patient C did not cough during suctioning; she heard no bowel sounds; and she received no response of any kind to painful stimuli applied to Patient C's thumbs. (DAB Tr. Vol. 1 at 43-45.) Ms. Beck shared her initial assessment of Patient C with Dr. Kalla and Dr. Degani during morning rounds. (Id. at 45-46.)

Given Patient C's apparent unresponsiveness to the Levophed over the previous 12 hours as indicated by his declining MAP, Ms. Beck was confused about how to best proceed with administering the Levophed. (Id. at 78-79, 129; see also DAB

Tr. Vol. 3 at 7-8, 18-19 (describing conversation with Ms. Beck in which she was "perturbed" about the absence of a plan of care for Patient C and not being able to get information from the doctors about "why they were doing what they were doing" with Patient C's plan of care).) Specifically, she did not have guidance about how to reconcile the "no escalation" order with the standing order to maintain Patient C's MAP at or near 65, which would have required her to "keep going up and up [with the Levophed] until you can't go any further." (DAB Tr. Vol. 1 at 76-80.) To make a final assessment of the efficacy of the Levophed, she titrated it up "a point or two" to see if there was any change in Patient C's vital signs. (Id. at 116-18.) There were no changes and Patient C's MAP continued to decline. (Id. at 49; Flowsheet 11.)

At that point, Ms. Beck decided to complete a second full nursing assessment (DAB Tr. Vol. 1 at 49) and re-approach Dr. Kalla to discuss that the Levophed was not working (id. at 114). Ms. Beck told Dr. Kalla that she wished to "titrate" the Levophed.[6] (Id.) Dr. Kalla told her "okay" but did not give any

---

[6] Although Ms. Beck testified that she told Dr. Kalla that she was "titrating" the Levophed or that she was "going to titrate it," she later confirmed that she had "no recollection" of requesting permission "to titrate off" or "titrate the Levophed down to zero." (DAB Tr. Vol. 1 at 114-16, 130.) Of course, use of the term "titrate" alone indicates both upward and downward infusion. (Id. at 76, 115; DAB Tr. Vol. 2 at 76-77.) Accordingly, Dr. Kalla testified that if any nurse requested to "titrate" the Levophed, "okay" would have been a "standard" response to a request "to titrate" as there already was an order in place to maintain MAP at 65 or greater. (DAB Tr. Vol. 2 at 90-91.) To Dr. Kalla, "titrating the Levophed" "would mean the MAP is higher

7

specific orders.[7]  (Id. at 114, 130.)  Ms. Beck understood this verbal affirmation to mean that she should titrate the Levophed *completely off* because the drug was no longer having any therapeutic effect.  (Id. at 114-16.)  Indeed, by 11:00 AM or 12:00 PM on September 15, Ms. Beck had turned off the Levophed drip, and she noted it on Patient C's "flowchart" or "flowsheet," the paper-based medical records that remain at the bedside.  (Id. at 113-20, 129; Flowsheet 12.)  In the hours after the Levophed was discontinued, Patient C's MAP fell into the teens.  (Flowsheet 11.)  Neither Dr. Kalla nor any other physician ever wrote an order to titrate the Levophed to zero or to discontinue the Levophed.  (DAB Tr. Vol. 1 at 130.)  Dr. Kalla later testified that the Levophed was "pretty critical" in keeping Patient C alive (DAB Tr. Vol. 2 at 90), and Ms. Beck even acknowledged that given Patient C's condition, with the Levophed off "[s]ometime in the future" he "probably would not survive" (DAB Tr. Vol. 1 at 122-28).

---

than 65 and we had room to drop down the dose of the Levophed to a lower dose while maintaining the MAP at 65 or above."  (Id. at 91.)

[7]    Ms. Beck's testimony repeatedly reflects that she discussed the titration of Patient C's Levophed on the morning of September 15, 2008 with Dr. Kalla.  (DAB Tr. Vol. 1 at 114, 129-30.)  Her brief insists that she had this conversation with Dr. Degani, who did not testify at the hearing. (Pl.'s Br., Doc. 30-1, at 20, 24.)

## B.   Removal of Patient C from the Ventilator

Ms. Beck simultaneously served as a preceptor or mentor for RN Alexis Taylor during the September 15, 2008 shift.  (DAB Tr. Vol. 1 at 47-48, 135.)    RN Taylor had worked in the CCU for a matter of days.   (Id. at 135.)   Between 14:00 and 15:00, Ms. Beck reviewed Patient C's ventilator and noted that "the patient was delivering zero," meaning he was not breathing on his own. (Id. at 52.)   Seeing this as a teaching opportunity on brain death policies and neurological assessments, Ms. Beck then conducted what she describes as a "respiratory assessment." (Id. at 52, 58-59.)   To perform her assessment, Ms. Beck hyperventilated Patient C and then disconnected him from the machine in order to count the number of breaths he took voluntarily in a 60-second period.   (Id. at 41-42, 50-53.)   She counted four total breaths, and there was no desaturation or decrease in blood pressure.   (Id. at 53.)   On Patient C's chart, she made the notation "60-second brain death, respiratory, four breaths in 60 seconds."   (Id. at 42; Flowsheet 10.)   Ms. Beck testified that she referred to "brain death" only because she had looked up protocol on brain death with RN Taylor during training.   (DAB Tr. Vol. 1 at 46-53, 57-62.)   Patient C's chart indicates that his oxygenation fell to 85 percent within one hour after Ms. Beck performed her assessment.   (Id. at 41, 53-55; Flowsheet 11.)

Various witnesses, however, including RN Taylor and Dr. Kalla, later recounted Ms. Beck reporting that she had performed an "apnea test" on Patient C, not a "respiratory assessment." (DAB Tr. Vol. 1 at 144-147 (RN Taylor); DAB Tr. Vol. 2 at 66-68 (RN Mosley), 95-97 (Dr. Kalla); DAB R. at 193 (Dr. Kalla), 213 (Dr. Prosser), 225 (RN Mosley).) Indeed, during the hearing, Ms. Beck described the test she performed in more than one way: a "respiratory assessment" (DAB Tr. Vol. 1 at 52, 60) or a "neuro assessment" (id. at 51, 58, 116). An apnea test is part of a neurological exam "to determine brain death so a patient possibly could be used for organ transplantation." (DAB Tr. Vol. 1 at 35.) Only board certified physicians, typically in conjunction with a respiratory consult, may perform such a test, and thus it is wholly outside the scope of practice of an RN. (Id. at 34-36; DAB Tr. Vol. 2 at 146-47.) Moreover, "apnea testing was a very unusual process" that the CCU rarely practiced. (DAB Tr. Vol. 2 at 151-52, 156-57 (stating that the VAMC did not even have a clinical competence check-off for carrying out apnea tests); 210-12 (noting it was "extremely unlikely" that any nurse working in the CCU would have been reviewed for competency to perform apnea tests).)

RN Claudia Colber, a staff nurse in the VAMC's CCU during 2008, opined that nurses could conduct an "apnea assessment" for the purpose of ventilator associated pneumonia ("VAP") protocol,

which assessed whether a patient may be weaned off a ventilator,[8] or for suctioning purposes. (DAB Tr. Vol. 3 at 35-36.)

Patient C died roughly three hours after Ms. Beck discontinued the Levophed and approximately 1.5 hours after Ms. Beck removed him from the ventilator for 60 seconds. (CPRS Med. R. at 13.) After Patient C died, RN Mosley spoke with Ms. Beck in the break room. (DAB Tr. Vol. 2 at 65-67.) Ms. Beck allegedly said to Ms. Mosley that she "turned the drips off" and described herself as an "angel of mercy," or something to that effect. (Id.; DAB R. at 225.) According to Ms. Mosley, Ms. Beck's disposition at the time was as if she had done a "heroic act." (DAB R. at 225.) Ms. Beck later testified that she had "absolutely no knowledge of making that statement;" that it was not something she would "normally say" and was outside her "normal verbalization;" that she had no recollection of saying it; but that she could not say "a hundred percent that she did not say it." (DAB Tr. Vol. 1 at 184.) Ms. Beck also telephoned Dr. Mary Katherine Maeve, with whom she was developing a research project, and said, "Everybody ready for this, . . . I finally got those fuckers to turn off the drip." (DAB Tr. Vol.

---

[8] The VA called RN Chamele Coe, who was the Acting Nurse Manager for the CCU in 2008, as a rebuttal witness to RN Colber's testimony. (DAB Tr. Vol. 3 at 83, 86.) Although acknowledging that a patient may be removed from a ventilator to assist with deep suctioning, RN Coe testified that weaning trials under the VAP do not include taking the patient off the ventilator for any period of time. (Id. at 90-91.) He also explained that several medical conditions would prevent a weaning trial from taking place at all, including hemodynamic instability and vasopressor use, both of which applied to Patient C's condition at the time Ms. Beck removed him from the ventilator. (Id. at 87-88.)

3 at 8.) Prior to Patient C's death, Ms. Beck also expressed her opinion to Dr. Maeve that Patient C did not need to be in the CCU, but should have been receiving hospice or palliative care elsewhere. (Id. at 4, 6-9.)

## C. The VA's Actions After Patient C's Death

As previously described, the incidents that led to Ms. Beck's termination occurred on Monday, September 15, 2008 — the day of Patient C's death.

### 1. The VAMC and OIG Investigations

RN Rose Cowden-Wright, the Associate Nurse Executive at the time, did not learn of the issues with Patient C's care until two or three days after he passed away. (DAB Tr. Vol. 2 at 178-80.) RN Coe informed RN Cowden-Wright, based on information reported to him by other personnel, that there was a possibility that Ms. Beck had turned off Patient C's Levophed without an order and that she had performed an apnea test. (Id.) RN Cowden-Wright then inquired into whether there were "any written statements to that effect" because she was hesitant to rely on "he said that she said." (Id. at 184.) Indeed, in the days following Patient C's death, Detective Paul Andrews of the VA Police collected a non-sworn statement from both Dr. Degani and Dr. Kalla. (Id. at 184; DAB R. at 185-86.) RN Cowden-Wright also decided to meet with Dr. Kalla and Dr. Degani, who told her

that they did have "some conversation about discontinuing one [vasopressor] and titrating the other" and there had been some oral or verbal order at some point.  (DAB Tr. Vol. 2 at 191-92; DAB R. at 214.)  RN Cowden-Wright then consulted Dr. James K. Smith, the pulmonary attending physician on Patient C's case, and Dr. John Brice, the Chief of Medicine, about whether to commence an investigation.  (DAB Tr. Vol. 2 at 185-86.)

On September 18, 2008, the VAMC made a referral to the Office of Inspector General ("OIG").  (DAB R. at 109.)  OIG Special Agent ("SA") Carl Scott arrived at the VAMC on September 19, 2008 to initiate a complete investigation of a "suspicious death."  (Id. at 111.)  SA Scott conducted fourteen interviews of CCU personnel and returned to interview Dr. Kalla and RN Cowden-Wright twice.  (Id. at 124.)  SA Scott attempted to interview Ms. Beck on November 24, 2008, but he ended the meeting upon recommendation of the Assistant United States Attorney when Ms. Beck's counsel expressed his intent to make a recording of the meeting.  (Id. at 181.)  Upon receiving Patient C's toxicology report and conducting two final interviews, SA Scott issued the OIG report on September 9, 2009.  (Id. at 109.)  The OIG allegedly forwarded the results of its investigation to Ellen Harbeson, the Chief of Quality Management, sometime in late 2009 or early 2010, but Ms. Harbeson had retired.  (Id. at 129.)

## 2.   Ms. Beck's Deployments Post-Investigation

Between the time of Patient C's death and Ms. Beck's termination in 2011, she was on two year-long active duty deployments for the Army, as well as various short missions for the Reserves. (DAB Tr. Vol. 1 at 30.) Beginning September 20, 2008, Ms. Beck was on authorized absence until her November departure for a one-year active duty tour with the Warrior Transition Brigade at Walker Reed National Military Medical Center. (Id. at 31; DAB Tr. Vol. 2 at 187-88.) Upon return, Ms. Beck went on administrative leave with pay pending additional active duty orders. (DAB Tr. Vol. 1 at 32; DAB Tr. Vol. 2 at 190.) The Army again recalled Ms. Beck in late March 2010 for a second one-year deployment. (DAB Tr. Vol. 2 at 190.) By this time, there had been significant turnover in the VMAC's executive staff, which included the loss of its director, associate director, chief of staff, and nurse executive. (Id. at 222.) Upon completion of her military duties in late March 2011, Ms. Beck sought full reemployment with the VAMC, and the Human Resources Department began to familiarize itself with her background. (Id. at 239-240.) On April 19, 2011, the VAMC requested a copy of the OIG's report on its investigation into the death of Patient C. (DAB R. at 129-30.) The VAMC received it on or around May 19, 2011, and until that time it detailed

Ms. Beck to work in a non-clinical role doing chart reviews. (Id. at 126; DAB Tr. Vol. 1 at 170, 201-02.)

### 3. The VAMC's Proposed Removal

On June 9, 2011, RN Michelle Cox-Henley, the VAMC's current Associate Director for Patient/Nursing Services, issued a memorandum to Ms. Beck that proposed her removal from federal service for (1) exceeding her scope of practice as an RN; (2) failing to follow physicians' orders; and (3) endangering the safety of a patient. (DAB R. at 104-06.)

The first reason, referred to as "Charge I," related to three incidents, which the VAMC summarized in narrative form. First, the memo identified Ms. Beck's failure to "hold the course" or "continue the current level of care as prescribed" on September 12, 2008 per the family's wishes and Dr. Kalla's instruction. (Id. at 104.) Second, the memo addressed Ms. Beck's discontinuation of Patient C's "intravenous medication" — namely, the Levophed — on the morning of September 15, 2008 without an order. (Id.) Finally, the memo also faulted Ms. Beck for conducting an apnea test on Patient C "without an order or consent from a physician and without a Certified Respiratory Therapist present," noting specifically that she unhooked Patient C from the ventilator for one minute. (Id.)

The second reason, referred to as "Charge II," largely repeated the allegations outlined in the first, stating that Ms.

15

Beck "did not follow the physician's orders in that [she] made the decision to turn off the vasopressors." (Id.)

The third reason, referred to as "Charge III," again reflected upon Ms. Beck's September 15, 2008 decision to discontinue the prescribed medication that was "necessary for [Patient C] to sustain his condition" and to conduct an apnea test, all without orders, consent, or supervision. (Id. at 105.) Charge III narrated two additional instances of misconduct that compromised the patient's safety: (1) Ms. Beck expressed contempt for the doctors' plan of care for Patient C and proclaimed herself an "angel of mercy" in a demeanor that reflected intent to hasten Patient C's death, and (2) Ms. Beck provided care in "constant contradiction" to that provided by RN Ellis. (Id.) Specifically, Ms. Beck increased the use of both Versed and Fentanyl and discontinued the vasopressors during her shifts while RN Ellis did the opposite. (Id.)

Procedurally, the memo outlined Ms. Beck's right to reply to the charges orally or in writing to Al Ward, the Supervisor of Employee/Labor Relations, within fourteen days. (Id.) It also set forth that the evidence upon which the proposed removal was based would be available for Ms. Beck's review at the Human Resources Department offices and that the VA permitted employees to take up to eight hours of official duty time to do so. (Id. at 106.) Moreover, Ms. Beck had the right to be represented by

an attorney or other representative of her choice, designated in writing, in responding to the removal notice.  (Id. at 105-06.)

### 4.  Ms. Beck's Efforts at Response

In response to the proposed removal and the stress it caused, Ms. Beck sought four weeks of medical leave.  (DAB R. at 95-102.)  On June 17, 2011, Ms. Beck's counsel, Michael Garrett, contacted the VAMC about obtaining a fourteen-day extension to submit a written and/or oral reply.  (Id. at 92.)  On June 28, 2011, that extension was granted, establishing a new deadline of July 7, 2011.  (Id.)

It is undisputed that Ms. Beck did not submit a written reply by the July 7 deadline.  (DAB Tr. Vol. 1 at 218-20.)  This is because Ms. Beck and Mr. Garrett felt they were entitled to limited discovery over and above the evidence file so that they could make "an intelligent and complete reply."  (DAB R. at 92; DAB Tr. Vol. 1 at 213; Pl.'s Resp. to Def.'s Statement of Material Facts ("DSMF"), Doc. 44-1, ¶¶ 18, 19.)  After the July 7 deadline passed, Mr. Garrett and Ms. Beck requested a meeting with Acting Director Patricia O. Pittman.  (DAB Tr. Vol. 1 at 212-13; DAB Tr. Vol. 2 at 218-19.)  On July 21, 2011, Mr. Ward and Richard Rose conducted the meeting on behalf of Ms. Pittman. (DAB Tr. Vol. 2 at 218-19; see also DAB R. at 106 (noting that the deciding official may designate an official to receive an oral reply).)  Mr. Rose understood that the purpose of the

meeting was to discuss Ms. Beck's proposed removal from the VA and his role was to relay whatever information Ms. Beck presented to Ms. Pittman, the deciding official. (DAB Tr. Vol. 2 at 219, 253-54.) According to Ms. Beck, however, Mr. Rose did not bring up any specifics about the charges or evidence or initiate a review of the evidence, and therefore she and her attorney made the assumption that Mr. Rose was not prepared to discuss her case. (DAB Tr. Vol. 1 at 215; DAB Tr. Vol. 3 at 56-57.)

Instead, Ms. Beck presented an offer to resign voluntarily if the VAMC would agree not to report her conduct to the relevant state licensing boards. (DAB Tr. Vol. 1 at 215, 220; DAB Tr. Vol. 3 at 54.) RN Linda Carter, Ms. Beck's union representative in attendance, had assisted Mr. Garrett in setting up the meeting and, as she understood it, the meeting's sole purpose was to "attempt a negotiation" so that Ms. Beck could avoid the termination process and legal action. (DAB Tr. Vol. 3 at 52-54; see also DAB Tr. Vol. 2 at 220 (noting "[t]he gist of the matter seemed to be — or the gist of the discussion seemed to be more about her willingness to resign and if she were to resign, would we not proceed with reporting her to state boards").) Mr. Rose informed Ms. Beck, however, that he had an

ethical and regulatory obligation[9] to report her alleged misconduct to the licensing authorities at the conclusion of the administrative process. (DAB Tr. Vol. 2 at 233-34; DAB Tr. Vol. 3 at 55.) Ms. Beck responded, "I'm innocent, I have done nothing wrong." (DAB Tr. Vol. 3 at 55.) Before concluding, the meeting attendants had "some [further] discussion about the past administration that was [at the VAMC] during the event and what they did or did not do in the case and how [Ms. Beck] felt they were at fault for . . . the situation to a large degree." (DAB Tr. Vol. 2 at 221, 233-34, 238-39.) Ms. Beck also now contends by affidavit that she submitted a written response to the proposed notice of removal during that meeting.[10]

---

[9] VA Handbook 1100.18 § 7 states that "VHA directors, heads and other employees are not authorized to and must not enter into any formal or implied agreement that would prohibit or interfere with the reporting of a licensed health care professional to a state licensing board." (DAB R. at 268-69; see also DAB Tr. Vol. 2 at 234; DAB Tr. Vol. 3 at 65-66.)

[10] Ms. Beck's affidavit states, "I, along with my former attorney Michael C. Garrett, met with Mr. Rose and Mr. Ward at the VA Hospital in the Human Resources Conference Room No. 7A135 on July 21, 2011. On that date and at the meeting we submitted a Response to the termination letter of June 6, 2011 that had been served on me by Mrs. Henley-Cox." (Doc. 30-3.) Defendant moves to strike the affidavit because it is not part of the administrative record and constitutes a sham given Ms. Beck's testimony at the hearing. (Doc. 35 at 3-5.) For the reasons underlying the Court's ultimate decision, it need not reach the merits of Defendant's Motion to Strike, and in any case finds Ms. Beck's assertion in the affidavit to be wholly irrelevant as it is undisputed that (1) she did not respond to the VAMC's charges by the extended July 7, 2011 deadline (DAB Tr. Vol. 1 at 218-20) and (2) the VAMC, through Acting Director Rose, thought Ms. Beck presented an oral reply — albeit one in which she said very little — at the July 21, 2011 meeting (see DAB R. at 73, ¶ 2 ("In reaching my decision, I considered the information in the case file and the responses provided by both you and your representative."); DAB Tr. Vol. 2 at 252)).

## 5.  The VAMC's Removal Decision

According to Ms. Beck's notice of proposed removal (DAB R. at 104-06), after she presented her "oral reply" the VAMC had until either August 11, 2011 or August 19, 2011 to issue its decision.[11]  Mr. Rose, who in the month since the meeting with Ms. Beck and her attorney had transitioned into the Acting Director and deciding official roles on account of Ms. Pittman's expedited retirement, sent the VAMC's discharge decision on August 22, 2011.  (DAB R. at 73-74; DAB Tr. Vol. 2 at 252-53.) Mr. Rose sustained all the proposed charges and terminated Ms. Beck from federal service effective August 29, 2011.  (DAB R. at 73.)  His discharge notice was a verbatim copy of a draft that Ms. Pittman had prepared on July 19, 2011 but left unsigned, except in that it acknowledged Ms. Beck and her counsel provided "responses."  (See id. at 88-89.)  The only rationale presented in the discharge notice for upholding the proposed charges and punishment was the "gravity" of the situation.  (Id. at 73 ¶ 3.) The notice did outline, however, that Mr. Rose considered the Douglas factors in deciding whether any mitigation was

---

[11]     The notice states, "You will be given a written decision *within 21 days* of the receipt of your reply(ies) or, the close of business on the 14th day after you receive this notice if you do not reply." (DAB R. at 106 (emphasis added).)     From the Court's calculations, the VAMC granted Ms. Beck's extension request on the basis of fourteen business days rather than fourteen calendar days.  If the VAMC calculated its own deadline in the same manner, its decision was due on August 19, 2011.  If the notice required the decision to be issued within 21 calendar days, it was due on August 11, 2011.

appropriate.[12]   (See id.)   Mr. Rose later testified that he read

the VAMC's evidence file and OIG report to fully inform his

---

[12]     In Douglas v. Veterans Admin., 5 M.S.P.B. 315, 331-32 (1981), the Merit
Systems Protection Board established criteria that supervisors must consider
in determining an appropriate penalty to impose for an act of employee
misconduct.    These twelve factors are commonly referred to as "Douglas
Factors" and have been incorporated into VA Handbook 5021 on
Employee/Management Relations.   The twelve factors are:

> (1) the nature and seriousness of the offense, and its relation
> to the employee's duties, position, and responsibilities,
> including whether the offense was intentional or technical or
> inadvertent, or was committed maliciously or for gain, or was
> frequently repeated;
>
> (2) the employee's job level and type of employment, including
> supervisory or fiduciary role, contacts with the public, and
> prominence of the position;
>
> (3) the employee's past disciplinary record;
>
> (4) the employee's past work record, including length of service,
> performance on the job, ability to get along with fellow workers,
> and dependability;
>
> (5) the effect of the offense upon the employee's ability to
> perform at a satisfactory level and its effect upon supervisors'
> confidence in the employee's ability to perform assigned duties;
>
> (6) consistency of the penalty with those imposed upon other
> employees for the same or similar offenses;
>
> (7) consistency of the penalty with any applicable agency table
> of penalties;
>
> (8) the notoriety of the offense or its impact upon the
> reputation of the agency;
>
> (9) the clarity with which the employee was on notice of any
> rules that where violated in committing the offense, or had been
> warned about the conduct in question;
>
> (10) potential for the employee's rehabilitation;
>
> (11) mitigating circumstances surrounding the offense such as
> unusual job tensions, personality problems, mental impairment,
> harassment, or bad faith, malice or provocation on the part of
> others involved in the matter; and
>
> (12) the adequacy and effectiveness of alternative sanctions to
> deter such conduct in the future by the employee or others.

Id. at 305-06.   Ms. Pittman prepared a written analysis of the Douglas
factors as applied to Ms. Beck's case that accompanied her draft notice of

decision. (DAB Tr. Vol. 2 at 223.) Ultimately, Mr. Rose concluded that the "adverse patient outcome" was "directly attributable to [Ms. Beck's] positive actions at that time[,]" which "did not look like an error of omission." (Id. at 223-24, 228-29.) He "felt like Ms. Beck fully understood what the orders were, how to proceed in her profession being a very experienced nurse, and she moved forward without orders." (Id. at 227-28.) The DAB appeals policy was attached to the decision. (DAB R. at 74-85.)

### 6. The DAB Appeal & Hearing

The DAB received Ms. Beck's notice of appeal on September 14, 2011, and on September 28, 2011, the Under Secretary appointed a panel to hear Ms. Beck's case. (Id. at 2.) On October 28, 2011, Ms. Beck was notified of the names, professional designations, and places of employment of the panel members, which included an RN/Nurse Executive serving as the Associate Director of Patient Care Services, two RN Nurse Practitioners, and a Human Resources consultant whose role was to advise on technical matters. (Id. at 66.) At no point did

---

discharge. (DAB R. at 89-91.) No such analysis accompanies Mr. Rose's August 22, 2011 discharge notice in the DAB File, although there is some evidence in the record that suggests one existed: Mr. Rose "got some sort of response from human resources as to what the appropriate analysis of the Douglas factors would be" and testified that a separate set of Douglas factors was attached to Ms. Beck's discharge notice when he signed it. (DAB Tr. Vol. 2 at 242.) Mr. Rose further testified that he did not review the Douglas analysis prepared by Ms. Pittman in preparing for the July 21, 2011 meeting with Ms. Beck and her counsel. (Id. at 237.)

Ms. Beck object to the composition or qualifications of the DAB panel that convened to hear her case.

The DAB conducted a pre-hearing conference on December 5, 2011 at which (1) the parties discussed the witness lists and (2) the VA agreed to re-send Ms. Beck a copy of the evidence file. (DAB R. at 27-34.) The VA also informed Ms. Beck that it did not have jurisdiction over former VA employees and, to the extent she wished for such individuals to testify during the hearing, it would be up to her counsel to secure their attendance. (Id. at 33.) Finally, Ms. Beck's counsel submitted three motions for the DAB's consideration: a motion to dismiss, a motion for discovery, and a motion for continuance. (Id. at 33, 37, 48-54.) The DAB approved only the motion to continue for a period of 60 days with the understanding that Ms. Beck would waive the DAB's 120-day reporting requirement. (Id. at 33; see also id. at 83 (VA HANDBOOK 5021, PART V, CH. 1, § 9, ¶ C (Apr. 15, 2002/Mar. 5, 2004/Aug. 28, 2007)[13],[14].)

---

[13]    The appeals procedure as outlined in the VA Handbook states that "the Board shall reach a decision within 45 calendar days of completion of the hearing, if a hearing is convened. In any event, a decision will be made by the Board no later than 120 calendar days after the appeal is received by the Under Secretary for Health or designee." Ms. Beck admits that she waived the 120-day reporting requirement so that her case could be continued, but there is no evidence in the record that she also waived the 45-day reporting requirement. (Pl.'s Br. at 17; see DAB R. at 34.)

[14]    To the extent the Court can discern, the VA does not maintain a single, complete, authoritative version of Handbook 5021. Instead, its website contains fourteen different versions reflecting piecemeal revisions and updates over eleven years. See U.S. DEP'T OF VETERANS AFFAIRS, VA PUBLICATIONS, http://www1.va.gov/vapubs/Search_action.cfm (search "5021" in "Document Number" field). Indeed, the version that appears in the DAB File is stamped with three different publication dates over a mere ten pages. (See DAB R. at

On February 7, 2012, the DAB initiated a three-day hearing. (Id. at 5, 11.) The DAB heard from twelve witnesses, including Dr. Kalla, RN Taylor, RN Mosley, Dr. Maeve, RN and National Nurses United ("NNU") Associate Director Carter, and Mr. Rose. (See generally DAB Tr. Vols. 1 – 3.) The DAB rendered its decision and submitted its recommendation to the Under Secretary on May 15, 2012. (DAB R. at 10.) In a roughly 4.5-page written decision, the DAB sustained all charges in whole or in part and concluded that termination of Ms. Beck was "within the range of reasonableness" given that her "misconduct was so egregious." (Id. at 5-9.) Specifically, the DAB sustained Charge II in whole, but sustained only in part Charges I and III. (Id. at 2.) Here and elsewhere, the Court only addresses the specifications[15] within each charge that the DAB upheld, as those present the relevant grounds on which the discharge decision must be reviewed.

### a. *Charge I Sustained in Part*

The DAB broke down the VAMC's narrative of Charge I (Exceeding the RN's Scope of Practice) into three distinct

---

75-85.) The version attached as Appendix A to Defendant's response brief is not even available on the website. The Court thus makes its best effort to identify and coherently cite the relevant provisions of the relevant version when it relies on the Handbook in this Order.

[15] The DAB commented on the VAMC's failure to separate the facts into "specifications," finding it was error but "not technically [] harmful" as it merely left it "to the Board to separate each alleged set of facts." (DAB R. at 6.)

specifications: (A) discontinuation of medication without an order; (B) performance of an apnea test without an order or consent from a physician and without a certified respiratory therapist present; and (C) failure to "hold the course" with respect to the patient's care. (DAB R. at 6.) The DAB concluded that there was sufficient evidence to sustain the first two specifications. (Id. at 7.)

As to Specification A, the DAB determined that the preponderance of evidence — specifically, Patient C's flowchart, CPRS entries, and Ms. Beck's admission — favored the conclusion that "[Ms. Beck] did in fact discontinue the [Levophed] without an order." (Id. at 6.) Relying on its "clinical expertise," "professional nursing experience and judgment," and Idaho statutes that govern Ms. Beck's license,[16] the DAB found "that an

---

[16] The DAB stated it used the Idaho statutes as mere persuasive authority in defining "what actions are within and without the scope of an RN's practice." (DAB R. at 6.) Specifically, the DAB relied upon the following language: a "licensed professional nurse implements the strategy of care including medications and treatments *as prescribed by those healthcare providers authorized to prescribe medications.*" (Id. at 6, 133 (IDAHO CODE ANN. § 54-1402(4)(f).) Ms. Beck asserts that the Board denied her due process in reviewing and relying on these materials because it did not provide them to her in advance of the hearing and they constitute "rank hearsay" or "out of court declarations which [she] could not possibly refute." (See Pl.'s Br. at 19.)

First, regulations provide that the Chairperson of the DAB has the authority to "obtain[] further evidence concerning any issue under consideration by the Board at any stage of the proceeding." (DAB R. at 78 (VA HANDBOOK 5021, PART V, CH. 1, § 6, ¶ C (Apr. 15, 2002/Mar. 5, 2004/Aug. 28, 2007).) Second, a statute is not hearsay; it is not assertive. Here, the licensing statute is an adjudicative fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. CIV. P. 201(b)(2). Third, even if the statute is hearsay, it may still constitute substantial evidence in Ms. Beck's case so long as it is "not biased," "not inconsistent on its face," "has been recognized by courts as inherently reliable," or where it is "corroborated." See Consol. Edison Co. of NY v. NLRB, 305 U.S. 197, 230 (1938); Basco v. Machin, 514 F.3d 1177, 1182

RN acting within the scope of practice is not permitted to discontinue a medication without physician's [sic] orders or an agency policy providing direction to discontinue it." (Id.)

As to Specification B, the DAB determined that that the preponderance of evidence favored the conclusion that Ms. Beck's removal of Patient C from the ventilator for 60 seconds was outside her scope of practice. (Id.) The DAB noted that the VAMC's "clinical competence checklist[s]"[17] for RNs did not include this practice or an apnea test, and the VAMC's VAP protocol "indicated removal of this particular patient from the vent was contraindicated." (Id.) Importantly, however, the Board did not conclude that Ms. Beck performed an "apnea test" as set forth in the charging document. (Id.) Instead, the Board focused on the conduct of removing Patient C from the ventilator, finding such action was "contraindicated" for Patient C according to the VAP, not covered by the VAMC's clinical competence checklist, and "inconsistent with

---

(11th Cir. 2008); see also infra Part II.A.2 (describing the standard of review for "substantial evidence"). Without reference to the statute, Ms. Beck's testimony "corroborated" the principle stated in the statute: that nurses are not authorized to prescribe medications or treatment, must implement the plan of care designed by the physicians, and cannot deviate from the physicians' plan without an order. (DAB Tr. Vol. 1 at 64-65, 68-69, 112-13.) If the gravamen of Ms. Beck's concern actually is that she was not afforded notice of the statute in advance of the hearing so that she could refute its content or application, the Court fails to see how this prejudiced her given that the substance of her testimony *actually* refuted *neither* of those things. Id.; see also id. at 201 (noting she has a current Idaho nursing license that does not expire until 2013).

[17]    The clinical competencies checklist identifies certain special skills that RNs working in critical care areas must be certified or approved to perform, e.g., "lumbar drain," "management of malignant hyperthermia syndrome," or use of an "intra-aortic balloon pump." (DAB R. at 259-60.)

professional conduct based on the Board's clinical expertise."
(Id.)

### b. Charge II Sustained

The DAB wholly sustained Charge II (Failure to Follow Physician's Orders). (DAB R. at 7.) According to the Board, "[t]he uncontroverted evidence or record, including [Ms. Beck's] testimony, the patient CPRS records, Dr. Kalla's testimony[,] and the flowcharts indicated that around noon on September 15, 2008, [Ms. Beck] discontinued the Levophed without an order to do so." (Id. (internal citation omitted).)

### c. Charge III Sustained in Part

Like in Charge I, the Board broke down the VAMC's narrative of Charge III (Endangering the Safety of a Patient) into four distinct specifications: (A) discontinuation of prescribed intravenous medication; (B) performance of an apnea test without an order or consent from a physician and without a certified respiratory therapist present; (C) intentionally expediting the demise of the patient; and (D) improper use of Versed and Fentanyl. (DAB R. at 7-8.) The DAB concluded that there was sufficient evidence to sustain the first three specifications. (Id. at 8.)

As to Specification A, the DAB determined that the evidence supported the conclusion that Ms. Beck endangered Patient C's

safety by discontinuing the Levophed. (Id. at 6.) The Board principally relied on three pieces of evidence to sustain this specification: (1) Patient C's flowchart, which showed that his MAP dropped from approximately 30 to 15 after Ms. Beck discontinued the Levophed; (2) Dr. Kalla's testimony that the Levophed was "critical and instrumental in keeping the patient alive and perfusing his organs;" and (3) the fact that the patient died approximately three hours after discontinuation of the Levophed. (Id.)

In regard to Specification B, the DAB determined that the preponderance of evidence "indicate[d] that removing the patient from the ventilator endangered his safety" even though it did not find Ms. Beck conducted an "apnea test." (Id. at 8.) The DAB noted that "[u]pon removal of the ventilator [Patient C's] oxygen dropped from 100% to 85%," "[n]o further oxygen saturations were documented," and Patient C died 1.5 hours later. (Id.) The Board further acknowledged that it could not "state conclusively that removing the patient from the ventilator harmed him," but that "the immediate decrease in his oxygen saturation [was] objective evidence that [it] impacted him in a negative way." (Id.)

As to Specification C, the DAB found that Ms. Beck acted intentionally to hasten Patient C's death. (DAB R. at 8.) Noting that Ms. Beck did not deny that she had described herself

as an "angel of mercy" with reference to Patient C's medication, the Board found RN Mosley's testimony confirming such a statement to be credible. (Id.)

In a separate paragraph apparently unrelated to any specification in Charge III, the Board added that "it was difficult to quantify the degree of harm [Ms. Beck] may or may not have caused the patient by her actions" given that the patient was "in the final stages of life and likely to die at any moment." (Id.) The DAB also commented here on the credibility of certain evidence, namely that it declined to give weight to the discharge diagnosis and summary[18] Dr. Kalla prepared after Patient C's death because he dictated it almost three months after the patient died. (Id.) Dr. Kalla also testified that he did not review the content of the summary before Dr. Smith signed it. (DAB Tr. Vol. 2 at 122.) The Board also "questioned the credibility" of the progress note Dr. Kalla prepared on the day of Patient C's death. (DAB R. at 8.) Although Dr. Kalla entered the note around 08:15 that morning, he "did not follow the usual pattern of signing his

---

[18]    Ms. Beck emphasizes that the summary (CPRS Med. R. at 1) did not list among the eight "causes" of Patient C's death that something happened contrary to the physicians' orders. (DAB Tr. Vol. 2 at 118-19, 124-25.) Dr. Kalla explained that "there is no opportunity for easy revision of the discharge summary" and that there is no hard-and-fast rule at the VAMC about including nurse or doctor error in the discharge summary. (Id. at 126-27.) He continued: "I am not a person who objectively makes a statement to make somebody look bad if I don't know all the facts. At the time this happened, I wasn't a hundred percent certain — at the time I dictated this, I wasn't certain of all the facts. I knew what I heard but I don't like dictating hearsay. And so I dictated exactly what I thought would be correct to dictate" — "my objective observations." (Id. at 127.)

notes . . . after making rounds." (Id.; see CPRS Med. R. at 18.) Dr. Kalla did not sign the progress note for Patient C until approximately 16:30, after the patient had passed. (DAB R. at 8; CPRS Med. R. at 18.)

### d. Penalty Upheld

Under the heading "Penalty determination," in terse form the DAB found that Mr. Rose's decision to terminate Ms. Beck was reasonable because her "misconduct was so egregious." (DAB R. at 9.) The Board noted, as did Mr. Rose, that Ms. Beck had an exemplary military service record and no disciplinary history, but went on to state that

> there appeared to be some confusion in this case in how [Ms. Beck] was instructed concerning the care for this patient, and the Board acknowledges the possibility that this confusion was not solely [Ms. Beck's] responsibility. However, the Board finds that in the absence of clear orders, [Ms. Beck] should have clarified any confusion prior to taking the actions she did.

(Id.)

The Under Secretary timely issued his final decision adopting the DAB's recommendation approximately 2.5 months later on August 2, 2012. (Id. at 2-3.)

## II.  STANDARDS OF REVIEW

### A.  Administrative Review

Employment of VA healthcare professionals appointed under 38 U.S.C. § 7401(1)[19] is governed, in large part, by Chapter 74 of Title 38.  The provisions of this chapter treat these healthcare professionals differently from ordinary civil service employees who are covered exclusively by Title 5.  Of particular relevance here is 38 U.S.C. § 7461(b)(1), which provides § 7401 employees the right to appeal to the DAB a "major adverse employment action"[20] resulting from a charge that arises out of a question of professional conduct or performance.

This Court's review of the DAB's final action is governed by 38 U.S.C. § 7462(f)(2), which provides:

> In any case in which judicial review is sought under this subsection, the court shall review the record and hold unlawful and set aside any agency action, finding, or conclusion found to be —
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> >
> > (B) obtained without procedures required by law, rule, or regulation having been followed; or
> >
> > (C) unsupported by substantial evidence.

---

[19]    Section 7401(1) covers "[p]hysicians, dentists, podiatrists, chiropractors, optometrists, registered nurses, physician assistants, and expanded-function dental auxiliaries."

[20]    Major adverse actions include suspension, transfer, reduction in grade, reduction in basic pay, or discharge.  38 U.S.C. § 7461(c)(2)(A)-(E).

The Court's review under this section "directly mirrors the standards for judicial review of other administrative actions." Lerner v. Shinseki, No. 3:12-CV-00565, 2013 WL 5592906, at *5 (W.D. Ky. Oct. 10, 2013) (citing Rajan v. Principi, 90 F. App'x 262, 263 n.1 (9th Cir. 2004)). Analogous administrative law precedents, therefore, are applicable.[21] Abaqueta v. United States, 255 F. Supp. 2d 1020, 1024 (D. Ariz. 2003) (citation omitted).

### 1. Arbitrary & Capricious

For purposes of § 7462(f)(1)(A), an agency's decision is "arbitrary and capricious" if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Defenders of Wildlife v. Dep't of the Navy, 733 F.3d 1106, 1115 (11th Cir. 2013) (citations omitted); Taylor v. Principi, 92 F. App'x 274, 276-77 (6th Cir. 2004) (citations omitted); see also Kreso v. Shinseki, No. 11-CV-02378-REB-MJW,

---

[21] Although the parties styled their filings as cross-motions for summary judgment, 38 U.S.C. § 7462 governs the Court's review of this case rather than Federal Rule of Civil Procedure 56. Nevertheless, the Clerk gave the parties appropriate notice of the motions for summary judgment and informed them of the summary judgment rules, including the right to file affidavits or other materials in opposition and the consequences of default. (Docs. 31 & 33.) Thus, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), have been satisfied.

2014 WL 4436418, at *2 (D. Colo. Sept. 9, 2014) (citing Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1574 (10th Cir. 1994)).

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of an agency." Dollander v. Peake, No. CV 106-065, 2008 WL 2113035, at *3 (S.D. Ga. May 19, 2008) (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). Thus, "the court may not supply a reasoned basis for the agency's action that the agency itself has not given, [and] a decision of less than ideal clarity should be upheld if the agency's path may reasonably be discerned." Lerner, 2013 WL 5992906, at *5 (citations omitted); see also Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 558 (1978) ("Administrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute, not simply because the court is unhappy with the result reached.") (internal citation omitted). "Consequently, a decision will be upheld if it is the result of a deliberate principled reasoning process." Lerner, 2013 WL 5992906, at *5 (citation omitted).

## 2. Substantial Evidence

Under § 7462(f)(2)(C), the Court also may set aside any agency action that is unsupported by substantial evidence. To determine whether the Board's findings are supported by substantial evidence, the Court must determine whether the Board considered "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); see also Fla. Med. Ctr. of Clearwater, Inc. v. Sebelius, 614 F.3d 1276, 1280 (11th Cir. 2010) (citation omitted). "Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence." Lerner, 2013 WL 5592906, at *6 (citing R.P. Carbone Constr. Co. v. Occupational Safety & Health Review Comm'n, 166 F.3d 815, 818 (6th Cir. 1998)). "Evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion." Kreso, 2014 WL 4436418, at *1 (citing Olenhouse, 42 F.3d at 1581). "The substantiality of the evidence must be based on a review of the record as a whole, and the reviewing court is not free to disregard contrary evidence in the record." Id. (citing Washington v. Shalala, 37 F.3d 1560, 1581 (10th Cir. 1994)). "The Court must affirm the agency's decision if it is supported by substantial evidence, even if the Court would have decided the issue differently." Lerner, 2013 WL 5592906, at *6 (citations omitted).

Finally, because administrative agencies are not restricted to the rigid rules of evidence,[22] hearsay "which has rational probative force" may constitute substantial evidence. Gilbert v. Johnson, 419 F. Supp. 859, 880 (N.D. Ga. 1976), aff'd in part, rev'd in part on other grounds, 601 F.2d 761 (11th Cir. 1979); see also Lerner, 2013 WL 5592906, at *6. On the other hand, administrative findings, "to be valid, cannot be based upon hearsay alone, nor upon hearsay corroborated by a mere scintilla." Gilbert, 419 F. Supp. at 880 (citing Willapoint Oysters, Inc. v. Ewing, 174 F.2d 676, 690 (9th Cir. 1949)). "Mere uncorroborated hearsay or rumor does not constitute substantial evidence." Consol. Edison, 305 U.S. at 230. "Whether hearsay constitutes substantial evidence must be weighed in light of the whole record." Gilbert, 419 F. Supp. at 880 (citation omitted). In analyzing the probative force of hearsay evidence in the administrative context, the Court should consider whether

> (1) the out-of-court declarant was not biased and had no interest in the result of the case; (2) the opposing party could have obtained the information contained in the hearsay before the hearing and could have subpoenaed the declarant; (3) the information was

---

[22]   Dir. of Office of Thrift Supervision, U.S. Dep't of Treasury v. Lopez, 960 F.2d 958, 964 n.11 (11th Cir. 1992) (citing Richardson v. Perales, 402 U.S. 389, 402 (1971) and Williams v. U.S. Dep't of Transp., 781 F.2d 1573, 1578 n.7 (11th Cir. 1986)).

not inconsistent on its face; and (4) the information has been recognized by courts as inherently reliable.[23]

Basco v. Machin, 514 F.3d 1177, 1182 (11th Cir. 2008) (citations omitted).

### B. **Statutory Due Process**

The procedure for disciplining an RN employed by the VA for an incident arising out of "professional conduct or competence" resulting in a "major adverse action" is outlined in 38 U.S.C. § 7462(b)(1) and implemented by VA Handbook 5021 ("the Handbook"). The statute sets forth that the employee is entitled to written notice of the charges, a reasonable time to present an oral and written answer supported by evidence, and the right to be represented by an attorney or other representative at all stages of the case. 38 U.S.C. § 7462(b)(1) & (2). In particular, the written notice must provide the basis for each charge and a "statement of any specific law, regulation, policy, procedure, practice, or other specific instruction that has been violated." Id. § 7462(b)(1). The Handbook clarifies that at minimum, therefore, the notice

---

[23] The Sixth Circuit also has set forth useful analytical factors: (1) the independence or possible bias of the declarant; (2) the type of hearsay material submitted; (3) whether the statements are signed and sworn to as opposed to anonymous, oral, or unsworn; (4) whether the statements are contradicted by direct testimony, (5) whether the declarant is available to testify; and, if so (6) whether the party objecting to the hearsay statements subpoenas the declarant, or whether the declarant is unavailable and no other evidence is available; (7) the credibility of the declarant if a witness, or of the witness testifying to the hearsay; and (8) whether the hearsay is corroborated. Lerner, 2013 WL 5592906, at *6 (citing R.P. Carbone, 166 F.3d at 819).

must include statements "of the specific charges upon which the proposed action is based, including names, dates, places, and other data sufficient to enable the employee to fully understand the charges and to respond to them" and "any specific law, regulation, policy, procedure, practice, or other specific instruction (national, local or otherwise) that has been violated as it pertains to the charge(s) (*if applicable*)." VA HANDBOOK 5021, PART II, CH. 1, § 5(b) (Apr. 15, 2002) (emphasis added).

The statute further sets forth various time periods at which the stages of the proceedings progress. First, the deciding official must render a decision on the proposed action in writing within 21 days of receiving the employee's answer. 38 U.S.C. § 7462(b)(3)(A). Any appeal by the employee to the DAB from that decision must be received within 30 days thereafter. Id. § 7462(c)(1). Upon appeal, the Board must render a decision within 45 days of completion of the hearing, if there is a hearing, and in any event no later than 120 days after the appeal commenced. Id. § 7462(c)(4). The Secretary then must execute the decision of the DAB in a "timely manner" but not more than 90 days after the decision of the Board is received by the Secretary. Id. § 7462(d)(1).

Section 7462, however, provides no remedy in the event a decision and the execution of that decision is delayed. Classen

v. Brown, 33 F. Supp. 2d 511, 518 (N.D. Va. 1998). Indeed, the harsh consequences that accompany jurisdictional rules generally do not apply in the context of an administrative scheme's procedural "claim-processing rules" absent a showing of harm or prejudice. See id.; Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 1206 (2011) (finding 38 U.S.C. § 7266(a)'s 120-day period for filing a notice of appeal in the Court of Appeals for Veterans Claims was a "claim-processing rule" without jurisdictional implications); see also Gilbert, 419 F. Supp. at 883-84 ("We are unwilling to say that every deviation from specified procedure, no matter how technical, automatically invalidates a discharge, especially in the absence of any showing of prejudice.")(citing Dozier v. United States, 473 F.2d 866, 868 (5th Cir. 1973)[24]).

This is consistent with 5 U.S.C. § 706's instruction to reviewing courts to take "due account . . . of the rule of prejudicial error." Section 706 applies even if judicial review of the agency's action is expressly provided for by an enactment other than the Administrative Procedures Act, as is the case here. See Ala. Hosp. Ass'n v. Beasley, 702 F.2d 955, 958 n.7 (11th Cir. 1983). "Courts have not hesitated to apply a harmless error rule where the agency has committed an error that

---

[24] See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (holding Fifth Circuit decisions made on or before September 30, 1981, are binding precedent in Eleventh Circuit).

clearly had no bearing on its substantive decision." Id. at 958 (citations omitted). Indeed, "procedural errors are deemed harmless unless the court has a 'substantial doubt' that the agency would not have reached the result it did." Id. at 958 n.8 (citation omitted). Courts must be cautious, however, in applying the doctrine of harmless administrative error where agency action implicates basic due process rights – the meaningful opportunity to obtain information, to be heard, and to retain and be represented by counsel, if permitted. Id. at 958 n.6 (citing Doe v. Hampton, 566 F.2d 265, 277 (D.C. Cir. 1977) and Yiu Fong Cheung v. Immigration & Naturalization Serv., 418 F.2d 460, 463 (D.C. Cir. 1969)); see also Dozier v. United States, 473 F.2d at 868 (declining to invalidate a discharge on the basis of an alleged procedural due process violation because although the plaintiff did not have a copy of the "case record," his counsel was able to review all of the agency's evidence and had access to the records of prior proceedings).

## III. DISCUSSION

Ms. Beck challenges the DAB's decision as (1) arbitrary and capricious, (2) not supported by substantial evidence, and (3) contrary to due process. Defendant moves for judgment in its favor on the same grounds, contending that Ms. Beck was afforded all process due and that its decision to discharge her was not

arbitrary, but rather supported by substantial evidence. The Court addresses each argument in turn.

### A.    Arbitrary & Capricious

As stated above, in assessing whether an agency determination is arbitrary and capricious, the Court's role is to ensure that the applicable procedures have been followed and that the agency came to a rational conclusion as a result of a "deliberate, principled reasoning process." Reid v. Metro. Life Ins. Co., 944 F. Supp. 2d 1279, 1316 (N.D. Ga. 2013)(citation omitted); Classen, 33 F. Supp. 2d at 514 (citing Ross v. United States Postal Serv., 664 F.2d 191, 191 (8th Cir. 1981)); see also Defenders of Wildlife, 733 F.3d at 1115; Zahnd v. Dep't of Agric., 479 F.3d 767, 773 (11th Cir. 2007).

Ms. Beck, however, does not identify in her complaint, brief in support of summary judgment, response to Defendant's motion for summary judgment, or reply brief any particular aspect of the DAB's decision or process that was arbitrary and capricious.[25]   The word "arbitrary" appears only once in the

---

[25]   In the final pages of her brief in support of summary judgment, Ms. Beck does state that the only "possible conclusion" to be gleaned from her "set of circumstances and facts" is that she "failed to follow protocols in failing to note the order," and "although discipline might follow from such a charge, it is highly doubtful that it would support a discharge or termination." (Pl.'s Br. at 25.)   Judicial review of penalty determinations in § 7462 cases typically is addressed under the "arbitrary and capricious" standard.   See Kreso, 2014 WL 4436418, at *9-11; Lerner, 2013 WL 5592906, at *18-21.   To the extent Ms. Beck's aforementioned statement challenges the VAMC's decision to impose termination as opposed to some other punishment relative to the charges at hand, she has failed to show the absence of a rational connection between the DAB's findings of fact and the discharge

complaint and five other times in all Ms. Beck's filings, each instance solely in conjunction with the recitation of 38 U.S.C. § 7462(f)(2) or the standard of review.[26]    Indeed, Ms. Beck's failure to respond at all to Defendant's well-identified and targeted arguments with respect to the DAB's deliberative process (see Def.'s Br., Doc. 32-1, at 37-40) indicates that she does not oppose them.    See LR 7.5, SDGa.    ("Failure to respond . . . shall indicate that there is no opposition to a motion."); see also Northington v. Dreamland Amusements, Inc., No. CV 111-014, 2012 WL 1656919, at *5 (S.D. Ga. May 10, 2012) (citing Lazzara v. Howard A. Esser, Inc., 802 F.2d 260, 269 (7th Cir. 1986) for the proposition that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned).

Even so, upon thorough review of the whole record, the Court does not find any basis to hold that the Board's decision to terminate Ms. Beck was arbitrary and capricious.    At the outset, the Board made astute inquiries to clarify discrepancies

---

decision. Kreso, 2014 WL 4436418, at *9 (citing Olenhouse, 42 F.3d at 1574). Indeed, she offers no response to Defendant's argument that the evidence of her "disrespect for the physicians," "willingness to substitute her medical judgment for that of the assigned physicians," and "[willingness] to substitute her beliefs about end-of-life care for those of the patient's family members" all but required discharge. (Def.'s Br., Doc. 32-1, at 40.) The Court, therefore, will not engage in any analysis as to whether discharge was the appropriate penalty as Defendant's argument is unopposed. See LR 7.5, SDGa.

[26]    The only potential exception is Ms. Beck's use of "arbitrary" in the heading "The Conclusions Reached by the DAB were Arbitrary or Not Supported by Substantial Evidence." (Pl.'s Br. at 19 (emphasis added).)    The entirety of the argument following this heading, however, attacks the DAB's lack of evidentiary support for its conclusions.

41

it identified in the record and to familiarize itself with the policies in place at the VAMC at the time of Patient C's death. (See DAB R. at 26, 39-40, 69-70.)

The Board based its decision on some facts that were not in dispute, review of Patient C's computerized medical records, the requirements of "applicable nursing licensing and practice authorities,"[27] Ms. Beck's testimony, and the testimony of eleven additional witnesses, two of whom Ms. Beck called and many more of whom cooperated with the OIG's initial investigation. (Def.'s Br., Doc. 32-1, at 38.) The DAB declined to give weight to some evidence that it determined lacked credibility. (See DAB R. at 8.) The Board also considered conflicting testimony and, to arrive at a conclusion about some pertinent facts to Ms. Beck's dismissal, it had to determine which witnesses were most credible and reliable. (Compare Beck Hearing Testimony, DAB Tr. Vol. 1 at 184 with RN Mosley Hearing Testimony, DAB Tr. Vol. 2 at 65-67 and DAB R. at 225 (discussing Ms. Beck's purported statement that she was an "angel of mercy"); RN Cox-Henley Hearing Testimony, DAB Tr. Vol. 1 at 165-68 and RN Cowden-Wright Hearing Testimony, DAB Tr. Vol. 2 at 146-59, 170 and RN Coe

---

[27] In a section labeled "Reference Material," the DAB File includes excerpts from the American Association of Critical Care Nurses ("AACN") Procedure Manual on "Determination of Death." (DAB R. at 249-58). Although AACN procedures did not constitute "VA policy," it was the CCU's "procedural guideline" in 2008. (DAB Tr. Vol. 2 at 153; see also id. at 209-10.) RN Cowden-Wright also testified that the CCU relied on the "Lippincott Manual," the "AORN Guidelines and Procedures," and "other similar national organizations." (Id. at 209-10.) Haphazardly sandwiched by OIG investigation materials are the Idaho and Georgia licensing statutes for nurses. (DAB R. at 132-80.)

Hearing Testimony, DAB Tr. Vol. 3 at 87-91 _with_ RN Colber

Hearing Testimony, DAB Tr. Vol. 3 at 35-36 (discussing under

what circumstances, if any, nurses at the VAMC were allowed to

perform an apnea test and/or remove a patient from a

ventilator).) There is no evidence in the record to suggest

that the DAB's credibility determinations on key facts were

arbitrary and capricious.[28]

The DAB spoke specifically to the difficult issue of

causation, noting that from the evidence it was hard "to

quantify the degree of harm" Patient C suffered as a result of

Ms. Beck's actions. (_Id._) It credited Ms. Beck's contention

that she received unclear directions and there was some

"confusion" among multiple parties about the course of Patient

C's care. (_Id._) Indeed, the Board ultimately decided not to

sustain some specifications against Ms. Beck for which the VA

did not bear its burden of proof. (DAB R. at 7-8.) It is

clear, therefore, that in rendering its decision, the DAB

---

[28] For the sake of thoroughness, the Court notes the OIG report included a reference to Ms. Beck's concern that "a group of employees were briefed as to what to say during the investigation by Coe" and "the physicians were all briefed on what to say during the investigation by Dr. Brice." (DAB R. at 181.) Mr. Garrett, Ms. Beck's former attorney, also apparently reported to SA Scott that "something [was] going on between Beck and Cowden-Wright for approximately 18 months." (_Id._) Ms. Beck, however, did not raise these claims of "tampering" or impropriety in her Complaint or briefs. RN Cowden-Wright did admit while under oath at the hearing that she held a staff meeting regarding "the situation that occurred with respect to [P]atient [C]", she explained the point of the meeting was to "ask[] [the staff] to testify what they knew, if they knew anything about the patient's death, but not feel compelled to testify on hearsay or any other matter like that." (DAB Tr. Vol. 2 at 199.) Moreover, in response to the question "Did you ever tell anyone in a staff meeting to be anything other than a hundred percent truthful?" RN Cowden-Wright said, "I did not." (_Id._)

engaged in a "deliberate, principled reasoning process" by sifting through the facts and evidence with respect to *each* specification and considering *all* important aspects of the problem with Patient C's care, including those that were outside of Ms. Beck's control.

The DAB also referenced objective standards and criteria to sustain the charges against Ms. Beck. Cf. Lerner, 2013 WL 5592906, at *17-18 (finding the DAB's decision was arbitrary and capricious because it "failed to identify and utilize any sort of objective measure and to offer a reasoned explanation" why employee's conduct constituted "inappropriate conduct," instead employing a "subjective standard, based on its impressions of [the employee] and his apparent lack of remorse at the hearing"). For instance, to support the charge that Ms. Beck acted outside the scope of an RN's practice with respect to the discontinuation of Patient C's Levophed, the DAB cited as persuasive Idaho licensing statue § 54-1402(4)(f), which sets forth that nurses must carry out the program of care designed by those with the authority to prescribe medications and courses of treatment. Even without reference to this statute, however, Ms. Beck understood that when a physician orders a medication, an RN does not have the authority to give that medicine in a way contrary to what has been ordered. (DAB Tr. Vol. 1 at 64-65, 68-69, 112-13.) Although there was ample conflicting testimony

as to what type of test Ms. Beck actually performed when she removed Patient C from the ventilator, to support the charge that Ms. Beck acted outside the scope of an RN's practice when she did so the DAB cited the VAMC's competency checklist that indicated it neither trained nor certified its nurses to perform apnea tests. Again, Ms. Beck stipulated that she was not competent to perform any test related to neurological function or brain death. (DAB Tr. Vol. 1 at 34-37, 204; DAB Tr. Vol. 2 at 170-71.) Apparently crediting Ms. Beck's and RN Colber's testimony that nurses could perform some types of assessments that involved ventilated patients, however, the DAB further cited the VAP protocol to demonstrate that Patient C was not a candidate for weaning, that weaning assessments required some participation by the respiratory department, and initial assessments did not require patients to be removed from the ventilator at all. (DAB Tr. Vol. 2 at 203-05; DAB Tr. Vol. 3 at 40-43, 87-91, 93.) To support the VAMC's contention that Ms. Beck endangered Patient C's safety, the DAB relied upon the medical records — many of which reflected Ms. Beck's own charting — to demonstrate that Patient C's condition worsened after Ms. Beck took the challenged actions. (DAB R. at 7-8.) There is no evidence in the record to suggest that such reliance was misplaced or arbitrary and capricious.[29]

_____

[29]    Ms. Beck alleges in the Complaint that Patient C's records are

45

Based upon the foregoing and Ms. Beck's failure to alert the Court to any specific aspect of the DAB's deliberative process that was irregular, the Court finds the Board's decision was not arbitrary and capricious.

## B.    Substantial Evidence

Ms. Beck chiefly argues that the DAB's decision was not supported by substantial evidence.    As noted above, "[s]ubstantial evidence is more than a scintilla, but less than a preponderance, of the evidence." Lerner, 2013 WL 5592906, at *6 (citing R.P. Carbone, 166 F.3d at 818).    It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co., 305 U.S. at 229; see also Fla. Med. Ctr. of Clearwater, 614 F.3d at 1280.    "Evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion." Kreso, 2014 WL 4436418, at *1. Regardless of the DAB's stated reasons for reaching its conclusion, the Court must affirm the DAB's decision if it

"incomplete" and "certain key entries" from September 15, 2008 were deleted. (Compl. ¶ 13.)    To the extent Ms. Beck argues that the purported gaps in Patient C's computerized medical records taint the VAMC's and DAB's use of them to such a degree that their ultimate decision was arbitrary and capricious, she neither presented it in her motion for summary judgment nor responded to Defendant's argument that she failed to prove any impropriety or the materiality of the "missing" information at the hearing.    Therefore, the Court treats any claim Ms. Beck grounds in the "incompleteness" or alleged mishandling of Patient C's medical records as abandoned.    See Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("Grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); Northington, 2012 WL 1656919, at *5; Seaboard Const. Co. v. The Weitz Co., LLC, No. CV 208-105, 2009 WL 3855185, at *5 (S.D. Ga. Nov. 17, 2009) (finding a party's failure to oppose summary judgment on specific counts demonstrated abandonment).

supported by substantial evidence on the record *considered as a whole*. Id. (citation omitted). The Court notes at the outset that the charges in Ms. Beck's case intimately relate to each other; indeed, the elements of proof often overlap susbtantially. The Court nevertheless proceeds to address each sustained specification separately, identifying the relevant evidence as presented by the parties and as revealed by the Court's own thorough review.

### 1. Charge I, Specification A

In regard to Specification A, the question before the Court is whether the DAB's conclusions that (1) Ms. Beck discontinued Patient C's Levophed (2) without an order and (3) *doing so exceeded the scope of her authority* as a nurse are supported by substantial evidence. The DAB opens its discussion of Specification A by noting that "[t]he patient's flowchart, the CPRS entries and [Ms. Beck's] admission during her testimony are undisputed . . . and amply demonstrated [Ms. Beck] did in fact discontinue the medication without an order." (DAB R. at 6.) As found by the DAB, Ms. Beck's own testimony and Patient C's flowchart provided substantial support for the conclusion that she discontinued Patient C's Levophed. (DAB Tr. Vol. 1 at 113-20; Flowsheet 12.)

The Board continued its discussion of Specification A by remarking that "a 'licensed professional nurse implements the

47

strategy of care including medications and treatments as prescribed by those healthcare providers authorized to prescribe medications.'" (DAB R. at 6 (citing IDAHO CODE ANN. § 54-1402(4)(f)).)

It found that "an RN acting within the scope of practice is not permitted to discontinue a medication without physician's order or an agency policy providing direction to discontinue it." (Id.) Ms. Beck's testimony evinced that she understood this principle. (Id. at 64-65, 68-69.)

What the Board gave short shrift – if any shrift – was the highly contested argument that Ms. Beck received an "order" of some sort from Dr. Kalla. Instead, to the extent the Court can discern, the Board relied solely upon the fact that nowhere in Patient C's medical records was there a notation by Ms. Beck or anyone else that a physician gave a written or verbal order to discontinue the Levophed. (See DAB R. at 5, 6.) This is technically correct, but a charting gap alone is not substantial proof that an order never issued, especially in the face of evidence that Ms. Beck implemented a purely verbal order in Patient C's case at least one other time without consequence.[30]

That leaves this Court to determine whether there is other support for the DAB's conclusion that Ms. Beck discontinued the

[30] Ms. Beck likewise had discontinued administration of Vasopressin after receiving a verbal order from Dr. Degani. (DAB Tr. Vol. 1 at 79-81; see also DAB R. at 104 (acknowledging, in the Proposed Notice of Removal, that Dr. Degani instructed Ms. Beck "to titrate the Levophed and wean [Patient C] off the Vasopressin as tolerated").)

Levophed without an order that meets the "substantial evidence" standard. On the one hand, it is undisputed that there was no written order to discontinue or "titrate to off" the Levophed. (DAB Tr. Vol. 1 at 130.) Furthermore, although Dr. Kalla could not recall having a conversation with Ms. Beck on September 15, 2008, he unequivocally denied ordering or telling Ms. Beck that she could titrate down the Levophed until it was off. (DAB Tr. Vol. 2 at 90.) This was "because [there was] an order to say no escalation of care and to maintain the care where it was until the family arrived" and the Levophed was "pretty important to keep [Patient C's] blood pressure up and help profuse his organs." (Id. at 90-91.) He further testified that if he had learned before Patient C passed away that the Levophed was turned off, he would have requested that it be turned back on notwithstanding Patient C's poor prognosis because only the family can decide to withdraw care. (Id. at 93-94.)

On the other hand, Ms. Beck testified that she received an oral order of "Okay" from Dr. Kalla after reporting that the Levophed was "not working" and she was "titrating" it. (DAB Tr. Vol. 1 at 114-15, 118, 130.) Specifically, she testified that she "requested and got an affirmation from Dr. Kalla." (Id. at 127.) Ms. Beck could not recall, however, whether she actually requested to titrate the Levophed *down to zero*. (Id. at 130.)

Based on the foregoing, the weight of the evidence supports the DAB's conclusion that Ms. Beck discontinued Patient C's Levophed without an order. Dr. Kalla's testimony, the absence of any written order, and the absence of any notation[31] that an oral order issued are not "overwhelmed" by other relevant evidence — namely, Ms. Beck's testimony.

## 2. Charge I, Specification B

In regard to Specification B, the question before the Court is whether the DAB's conclusions that Ms. Beck (1) removed Patient C from the ventilator to gauge his ability to breathe on his own (2) without an order or consent and (3) *doing so exceeded the scope of her authority* as a nurse are supported by substantial evidence. As found by the DAB, Ms. Beck's own testimony and Patient C's flowchart provided substantial support for the conclusion that she removed Patient C from the ventilator for 60 seconds without receiving either a written or verbal order to do so. (DAB Tr. Vol. 1 at 52-54, 62; Flowsheet 10.)

These facts being undisputed, the DAB opens its discussion of Specification B by noting that it found "the removal of the

---

[31] According to RN Colber, if a nurse accepted an oral order outside of the emergency context, which CCU nurses had been instructed not to do, the practice was as follows: take the verbal order, write it into the progress notes, and "the doctors are supposed to come back and sign it." (DAB Tr. Vol. 3 at 33-34; see also DAB Tr. Vol. 1 at 80, 107-08, 205-06; DAB Tr. Vol. 2 at 39.) Ms. Beck testified, however, that if a nurse writes a verbal order, a physician has to sign it *before* the nurse enters it into the medical record. (DAB Tr. Vol. 1 at 108.)

patient from the ventilator for 60 seconds was outside the scope of [Ms. Beck's] practice" even though the test she performed was not an "apnea test."   (DAB R. at 6.)   To support this conclusion, the Board cited two documents.   First, the Board identified the critical care clinical competency checklist, testimony about which suggested that the VAMC did not certify its nurses to perform "apnea tests."   (Id.; DAB Tr. Vol. 2 at 163, 165-66, 171-73, 211-12.)   Second, the Board cited the VAP protocol, which did permit patients to be removed from the ventilator in certain circumstances, but not those presented by Patient C's case.   (DAB R. at 6.)

Although not specifically cited by the DAB, Defendant elicited testimony from five witnesses to determine when, if at all, it would be *within* Ms. Beck's scope of practice to remove a patient from the ventilator for 60 seconds.   On the one hand, RN Cowden-Wright, the Associate Nurse Executive, explained that you would remove a patient from the ventilator during the initial VAP bundle only "[i]f you had an order to do a blood by trial or a spontaneous ventilation trial . . . , but otherwise it's discouraged to disconnect patients from a vent when they're intubated."   (DAB Tr. Vol. 2 at 203-04.)   She further explained that "weaning assessments" can occur "without totally disconnecting the patient from the vent circuit."   (Id. at 204.)

RN Coe, the Acting Nurse Manager, similarly testified that "spontaneous breathing trials" are not nurse-driven, but rather must be coordinated with and performed by the respiratory staff. (DAB Tr. Vol. 3 at 89-90.) He likewise testified about certain conditions that would counsel against removal of the patient from the ventilator, including "vasopressor use" and the patient's "lack of respiratory efforts." (Id. at 88-88.) He further affirmed that weaning trials in no way include or incorporate removing patients from the ventilator. (DAB Tr. Vol. 3 at 90-91.) The only possible purpose for which a nurse would remove a patient from the ventilator would be to "assist[] with deep suctioning." (Id. at 91.)

RN Cox-Henley, the current Associate Director for Patient/Nursing Services, testified that although she was not intimately familiar with the policies in place at the VAMC during 2008 (id. at 162-63, 167), generally ventilator system checks "are things that are done by a respiratory therapist" and the only time a patient would be taken off a ventilator for this purpose "would be in the presence of someone who was actually manually bagging the patient" (id. at 165-66). She further stated,

> [T]here are times when patients are taken off a
> ventilator. But if they are mechanically ventilator
> dependent, meaning they are not breathing on their own
> or maintaining the correct number of respirations per
> minute, no. That process, you know, in the literal

sense, may occur when you are weaning somebody off the respirator.

(Id. at 166.)  She continued,

> There are times when, by a physician order, a respiratory therapist may take the patient, drop his settings to evaluate his tolerance level, which could include taking him off for just a few minutes.  But that would be based on physician's order or unit protocol.  Unit protocol, which is also directed by physician order.

(Id. at 167.)

On the other hand, RN Colber testified that she removed patients from the ventilator "to bag them" or "to remove a mucous plug."  (Id. at 35.)  She further explained that nurses complete "apnea assessments" every twelve hours for the VAP protocol in which they "hyperoxygenate the patient and then . . . take them off for about 60 seconds to see the change in the blood pressure to see how many breaths they take" — the precise test described by Ms. Beck.  (Id. at 35-37.)  Indeed, she testified that nurses "pretty much . . . do it every time you take [the patient] off to suction them" (id. at 38-39) and may do it more frequently "depend[ing] on the condition of the patient and what's going on," particularly if patients "are in for pneumonia or they have a lot of secretions" (id. at 38-39).

Thus, according to RN Colber, the VAP protocol applies to *every* ventilated patient and its purpose is "to wean the patient off the ventilator to keep them from being on it for a prolonged amount of time."  (Id. at 36.)  RN Colber recognized, however,

that the VAP protocol may be contraindicated for certain paralyzed patients. (Id. at 42). And although admitting that the respiratory care team "participates in" VAP protocol assessments, RN Colber stated that critical care nurses must "take the initiative to protect the patient" when the respiratory care team is not available. (Id. at 40-41.) Critical care nurses, therefore, perform suctioning, increase patients' oxygen, and assess the effectiveness of the ventilator by counting patients' independent breaths over a 60-second period without the respiratory care team with some regularity. (See id. at 41-42.)

Ms. Beck, of course, also testified that based on her "long, extensive background in critical care," she believed she was "doing [an] authorized respiratory assessment, . . . an authorized checking with the mechanical ventilator to see if it was delivering." (DAB Tr. Vol. 1 at 178; see also id. at 52.) This "nursing assessment" was something she had integrated into her practice without reference to the VAP protocol specifically. (Id. at 179; see also id. at 51 (stating that a "nursing assessment" or "neuro assessment" was something Ms. Beck "had done for many years" on account of working in organ procurement).) Ms. Beck further stated that she was authorized to remove a patient from the ventilator for a maximum of 60 seconds because "[w]hen [] suction[ing] a patient, we can only

suction for 30 to 60 seconds. (Id. at 55-56.) Unlike Ms. Colber, however, Ms. Beck testified that removing a ventilated patient for a 60-second period to determine whether or not he is breathing over the ventilator is not part of her "routine" or "every day" practice, but rather comes up in "isolated instances" with "specific problematic patients." (DAB Tr. Vol. 1 at 62-64.)

If the DAB's decision was based *solely* on (1) the absence of any specific VAMC-approved competency for ventilator removal and (2) the contraindications under the VAP protocol, that decision was not based on substantial evidence. In fact, neither of these considerations has any direct bearing on the question whether Ms. Beck *needed an order* to perform the test she did and therefore practiced outside of her permissible scope. First, the mere absence of a "removal from ventilator" check-box on a competency form that Ms. Beck may or may not have received since 2004 (DAB Tr. Vol. 2 at 166-69) is overwhelmed by evidence that nurses at the VAMC remove patients from the ventilator with some regularity without an order in at least one context: suctioning. Moreover, Defendant elicited no testimony at the hearing about competencies for "ventilator removal;"[32] rather, the substance of the discussion was whether Ms. Beck was

---

[32]     The Court notes that there is a "mechanical ventilation" competency for which Ms. Beck was "approved," but neither party elicited any testimony as to what that check-off entails. (See DAB R. at 306-09.)

"checked out for any *apnea test* in the world." (See id. at 165-73 (emphasis added).)

Second, the mere fact that Patient C was not a candidate for weaning or a spontaneous breathing assessment in the Board's judgment says nothing about what the VAP protocol permits or forbids among registered nurses. It speaks only to whether these specific tests should have been performed at all, if that is in fact what Ms. Beck did. This conclusion is even more difficult to substantiate given that neither Defendant nor the DAB entered the policy itself into the record.[33]

But, regardless of the DAB's stated reasons for reaching its conclusion, the Court must affirm if the DAB's decision is supported by substantial evidence on the record considered as a

---

[33] Additionally, there is some dispute as to whether the VAP protocol was in place at the time of this incident. (See DAB Tr. Vol. 3 at 40-43, 91-93). And although Defendant invoked the VAP protocol only to aid in defining the scope of Ms. Beck's practice (rather than as a substantive charge), there is no evidence that Ms. Beck received training on it or even was aware that it existed. Compare Kreso, 2014 WL 4436418, at *4 (finding the DAB's conclusion that a doctor violated emergency department policy was well-supported even though there were few, if any, apposite written policies because the doctor's superiors repeatedly told him about the applicable policies and the doctor was aware of those policies) with Bellomo v. Derwinski, No. 91-2996 (TAF), 1992 WL 205639, at *7 (D.D.C. Aug. 7, 1992), aff'd sub nom., Bellomo v. Brown, No. 92-5350, 1993 WL 183974 (D.C. Cir. Apr. 26, 1993) (upholding the Board's conclusion that the technique used by the plaintiff to escort a patient was improper and noting that "[i]t may be that neither the plaintiff nor the nursing assistant were aware that current VA procedures precluded using the techniques employed by the plaintiff. The Board had sufficient evidence to conclude that the plaintiff *should have known* that the procedure he was using had been superseded. Further, even if the technique used had not been superseded, *or the fact that it had been had not properly been communicated to the plaintiff*, the Board's conclusion can still be sustained. The Board found that the amount of force used was excessive *under the circumstances*. Thus, *even if the technique used by the plaintiff might have been appropriate under certain circumstances, the Board concluded that it was used unnecessarily in this case*.") (emphasis added).

whole.  Kreso, 2014 WL 4436418, at *1 (citation omitted).  The

differences between the testimony of RN Cowden-Wright, RN Coe,

RN Cox-Henley on one hand and Ms. Beck and RN Colber on the

other hand are significant.  Unfortunately, this Court is

without the benefit of any explanation from the DAB as to the

credibility determinations it made between all the relevant

witnesses, if it made any at all.[34]  Ms. Beck's argument,

however, that "there is no evidence that [she] violated any

standard of practice or any protocol performing this test" based

on her own testimony and that of one other nurse who apparently

followed the same procedure does not change the rest of the

record.  (See Pl.'s Br., Doc. 30-1, at 21; Pl.'s Resp., Doc. 44,

at 10, 11.)

The weight of the testimony — that provided by RN Cowden-

Wright, RN Coe, and RN Cox-Henley — provides relevant evidence

that a reasonable mind might accept as adequate to support the

conclusion of the DAB on Charge 1, Specification B: that the

performance of *this* test *on Patient C* exceeded the scope of Ms.

Beck's practice as an RN in that she neither had a physician's

order or consent to perform it, nor the assistance of the

respiratory care team when she undertook it.  In one way or

another, each member of the nursing leadership testified that

---

[34]    To be clear, Ms. Beck does not argue (and this Court does not
insinuate) that the DAB is required to provide a detailed explanation of its
reasoning for crediting or not crediting particular testimony.  See Bellomo,
1992 WL 205639, at *6.

57

removing a patient from a ventilator for *any* extended period of time outside the suctioning context could occur only if an order was in place, and there was none here. (See DAB Tr. Vol. 1 at 52-54, 72; DAB Tr. Vol. 2 at 203-04; DAB Tr. Vol. 3 at 91, 167.) This testimony provides more than the "scintilla" of evidence necessary to sustain the charge.

### 3.  Charge II

In regard to Charge II, the question before the Court is whether the DAB's conclusion that Ms. Beck *failed to follow the physicians' orders* when she discontinued Patient C's Levophed is supported by substantial evidence. As found by the DAB, Ms. Beck's own testimony and Patient C's flowchart provide substantial support for the conclusion that she discontinued Patient C's Levophed. (DAB Tr. Vol. 1 at 113-20; Flowsheet 12.) As with Charge I – Specification A, Dr. Kalla's testimony, the absence of any written order, and the absence of any notation that an oral order ever issued provide substantial support for the DAB's conclusion that Ms. Beck discontinued Patient C's Levophed *without an order*. (See supra Part III.B.1.) Patient C's CPRS records, in fact, support that Ms. Beck discontinued Patient C's Levophed in the face of contrary, active orders to target his MAP to 65 or greater (see, e.g., CPRS Med. R. at 15, 16, 20, 29, 31, 33, 37, 38, 43, 44; see also DAB Tr. Vol. 1 at 68-71), a task for which a vasopressor like Levophed is the

58

essential ingredient. These facts provide competent, relevant evidence that a reasonable mind might accept as adequate to support the conclusion of the DAB that Ms. Beck failed to follow physicians' orders with respect to Patient C's care.

### 4. Charge III, Specification A

In regard to Specification A, the question before the Court is whether the DAB's conclusion that Ms. Beck *endangered the patient's safety* by discontinuing Patient's C Levophed is supported by substantial evidence. The DAB opens its discussion of Specification A with an undisputed factual chronology as evinced from Patient C's CPRS records: (1) an order was in place to titrate the Levophed to maintain a MAP of greater than 65; (2) Ms. Beck discontinued the Levophed around noon on September 15, 2008; (3) after discontinuing the Levophed, Patient C's MAP dropped from approximately 30 to 15; and (4) Patient C died around 03:00. (DAB R. at 7.) The remainder of the DAB's written decision relative to Specification A relies on Dr. Kalla's testimony that Levophed was "pretty critical" in keeping Patient C alive because it was necessary "to keep his blood pressure up and help perfuse his organs." (Id.; DAB Tr. Vol. 2 at 90.)

Ms. Beck concedes that Dr. Kalla was "[t]he only person with sufficient credentials to render an opinion on the patient's condition" and that "[h]e did opine that the lack of

the [Vasopressin and Levophed] for the patient at the time of his death was detrimental to maintaining blood pressure and therefore to maintaining life." (Pl.'s Br. at 21-22 (citing DAB Tr. Vol. 2 at 90).) Ms. Beck complains, however, that Dr. Kalla's testimony is not credible and by its own terms appears to indicate that Dr. Kalla committed malpractice. (See id. at 22-26.)

Ms. Beck also appears to dispute that discontinuing the Levophed endangered Patient C because, in reality, using the drug was "a vain attempt to keep the patient's blood pressure up" and "the decision to end Levophed was putting an end to [other] substantial harms being done to the patient." (Id. at 24, 26.) Ms. Beck's testimony stated that "because of the patient's condition, he was in complete renal failure" and his medications "were not working." (DAB Tr. Vol. 1 at 120.) Dr. Kalla also testified that Patient C was not a candidate for dialysis, and Levophed toxicity absent dialysis could cause issues with altered mental status and platelet dysfunction. (DAB Tr. Vol. 2 at 135-36.) RN Ellis also testified that high doses of Levophed could cause some shunting of a patient's circulation. (Id. at 58-59.)

Neither of Ms. Beck's arguments here, however, is prevailing. This Court is not the trier of fact, and it cannot overrule a credibility determination made by those who actually

heard the testimony.  <u>Ward v. Derwinski</u>, 837 F. Supp. 517, 522-23 (W.D.N.Y. 1992) (citations omitted).  The fact that the Board accepted some testimony from Dr. Kalla over that of Ms. Beck concerning the care of Patient C is not subject to review.  Nor is Ms. Beck's factual assertion that the Levophed was doing more harm than good.

It is apparent from the record that the DAB carefully considered Dr. Kalla's testimony.  Indeed, many of the Board's own pointed questions elicited much of the testimony about "harm" on which Ms. Beck now relies.  (<u>See</u> DAB Tr. Vol. 2 at 132-36.)  The Board also chose to disregard as not credible certain records produced by Dr. Kalla based on that same testimony.  (<u>See</u> DAB R. at 8.)  And although not cited by the DAB, the whole record reveals that Dr. Kalla was not the only medical professional to opine about the essential nature of Levophed: RN Cox-Henley stated it was "*the* therapy that was maintaining any sort of blood pressure on [Patient C]."  (DAB Tr. Vol. 1 at 161 (emphasis added).)

The objective reference to Patient C's vital signs and Dr. Kalla's and RN Cox-Henley's opinions about the essential role of Levophed in Patient C's care provide competent, relevant evidence that a reasonable mind might accept as adequate to support the DAB's conclusion: that discontinuing the Levophed — the sole vasopressor being administered to Patient C on

September 15, 2008 — endangered him in that it compromised his ability to maintain blood pressure. This evidence is not outweighed or "overwhelmed" by other relevant evidence — namely, that Levophed possibly causes adverse side effects if administered in high doses to patients with renal issues.[35]

## 5. <u>Charge III, Specification B</u>

In regard to Specification B, the question before the Court is whether the DAB's conclusion that Ms. Beck *endangered Patient C's safety* by removing him from the ventilator for 60 seconds is supported by substantial evidence. The entirety of the discussion of Specification B surrounds an undisputed factual chronology as evinced from Patient C's CPRS records: (1) Ms. Beck removed Patient C from the ventilator approximately two hours after discontinuing the Levophed; (2) Patient C's oxygen saturation then dropped from 100 percent to 85 percent; (3) Ms. Beck did not document any further oxygenation saturations; and

---

[35] Ms. Beck argues that had the VAMC "more thoroughly investigated the matter," it might have "determined that neither Dr. Kalla nor Dr. Degani were aware that the patient was in renal failure and should not have been treated with Levophed." (Pl.'s Br. at 19.) She continues, "if the proposing official had investigated the basis for each charge, the pharmaceutical properties of Levophed might have been investigated. And, if the notice had referenced the relevant policies and procedures a hospital drug monograph might have revealed this highly relevant medical error on the part of the treating physicians." (<u>Id.</u>) The Board acknowledged that the "confusion" in Patient C's case "was not solely [Ms. Beck's] responsibility," as does this Court. Dr. Kalla and Dr. Degani, however, are not VA employees and, more importantly, are not before this Court. Any malpractice committed by them is irrelevant and immaterial to the Court's determinations here. "[Ms. Beck's] criticism of other providers say[s] nothing about whether the DAB acted properly in sustaining the charges against her." (Def.'s Resp., Doc. 45, at 17.) Accordingly, the Court declines to give Ms. Beck's finger pointing any further consideration.

(4) Patient C died within 1.5 hours. (DAB R. at 8.) The DAB's written decision relative to Specification B concludes that "the immediate decrease in oxygen saturation is objective evidence that [removing Patient C from the ventilator] impacted him in a negative way." (Id.; see also Flowsheets 10, 11.)

Ms. Beck does not advocate an explicit position with respect to this specification.[36] Upon review of the whole record, there is no evidence that is unfavorable to the DAB's conclusion. See Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). RN Cox-Henley testified that "taking someone off a ventilator who is ventilator dependent to check to see if . . . they breathe when you take them off . . . stresses the patient unnecessarily," and given that Patient C was "very unstable[] to begin with," Ms. Beck's action "further taxed" his system. (DAB Tr. Vol. 1 at 161.) Moreover, the Board's decision appears to have taken into account that Patient C was gravely ill and "likely to die at any moment." (See DAB R. at 8 (recognizing that it "cannot state conclusively" that Patient C

---

[36] In a footnote, Ms. Beck takes issue with the Board's finding that the drop in oxygenation was evidence of endangerment, explaining that each prior entry in which she wrote "100% was a hyperventilated patient," not Patient C's actual oxygenation. (See Pl.'s Br. at 15 n.15.) The Court will not consider Ms. Beck's newly-presented explanation of her charting as it is not part of the administrative record. See Camp v. Pitts, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); Sierra Club v. Bosworth, 510 F.3d 1016, 1026 (9th Cir. 2007) ("Post-decision information may not be advanced as a new rationalization either for sustaining or attacking an agency's decision.") (internal alterations, quotation marks, and citation omitted).

was harmed nor specifically quantify the resulting degree of harm).)

The objective decrease in Patient C's vital signs as reflected in the medical records and RN Cox-Henley's testimony provides competent, relevant evidence that a reasonable mind might accept as adequate support for the conclusion of the DAB on Charge III, Specification B. The DAB considered the difficulty of assessing the actual harm caused, but the evidence as a whole substantially supports the conclusion that the removal of Patient C from the ventilator endangered his safety.

### 6. Charge III, Specification C

In regard to Specification C, the question before the Court is whether the DAB's conclusion that Ms. Beck acted "intentionally to expedite [Patient C's] demise," thereby endangering his safety, is supported by substantial evidence. The DAB opens its discussion of Specification C by noting that "[t]estimony given in the OIG report and during the Board hearing by Ms. Mosley indicated [that Ms. Beck] described herself as an 'angel of mercy.'" (DAB R. at 8.) The DAB continued, "[Ms. Beck] was questioned about this [and] she did not deny" it. (Id. (citing DAB Tr. Vol. 1 at 184-85).) The Board thus concluded that RN Mosley's testimony was credible and that Ms. Beck did in fact make such a statement. (Id.) As found by the DAB, RN Mosley's testimony — which is consistent

with the statement she gave to the OIG at the onset of the investigation in 2008 — in conjunction with Ms. Beck's reluctance to deny outright the rather sensational statement provide substantial support for the conclusion that Ms. Beck described herself as an "angel of mercy" on the day of Patient C's death. (DAB R. at 225-26; DAB Tr. Vol. 1 at 184-85; DAB Tr. Vol. 2 at 65-66.)

Again, however, the Board gave exceptionally short shrift to how it reached the conclusion that Ms. Beck's statement, made *after* Patient C's death at the end of the shift, reflected her intent many hours earlier to hasten his death. (See DAB R. at 8 (noting only that Ms. Beck made the statement "with reference to discontinuing the patient's medication").) And again, Ms. Beck chose not to present any argument with respect to this specification.[37]

---

[37]    In response to Defendant's Statement of Material Facts, Ms. Beck admits RN Mosley testified that she described herself as an "angel of mercy" during a conversation in the break room. (DSMF ¶ 127; Pl.'s Resp. DSMF ¶ 127.) Ms. Beck goes on to add, however, that "Florence Nightingale, the British nurse who is credited with founding modern nursing during the Crimean War was referred to as the 'Angel of Mercy.' No reasonable tribunal could find, within the bounds of due process, any evidentiary value in this statement." (Pl.'s Resp. DSMF ¶ 127.) She similarly argues in response to Paragraph 27 that "[i]n the nursing context, the term [Florence Nightingale] should be perceived as one with good connotations. Although Plaintiff does not remember using the term applied to herself, there would be little or nothing that could reasonably be made from the fact that she did." (Id. ¶ 27.) When asked about the "angel of mercy" statement during the hearing, the extent of Ms. Beck's testimony was that she could not unequivocally deny saying it. (See DAB Tr. Vol. 1 at 184-85.) Again, the Court will not consider Ms. Beck's newly-presented explanation of what she *would* have meant by "angel of mercy" *if* she used the phrase as it is not part of the administrative record. See Camp, 411 U.S. at 142.

On the one hand, RN Mosley reported to the OIG and testified before the DAB that Ms. Beck (1) came into the conference room at the end of her shift, (2) announced that Patient C died, (3) shared that she "turned the drips off" and took him off the ventilator for an apnea test, and (4) immediately thereafter described herself as an "angel of mercy" or "something along those lines." (See DAB R. at 225; DAB Tr. Vol. 2 at 65-66.)

Dr. Maeve further testified that during the weekend prior to Patient C's Monday passing, Ms. Beck expressed that Patient C should be in palliative care or hospice and that "he had a Levophed drip that in her opinion didn't need to be there." (DAB Tr. Vol. 3 at 6-7.) On the day Patient C died, Ms. Beck again called Dr. Maeve, this time stating "I finally got those fuckers to turn off the drip," "that Levophed drip." (Id. at 8-9.)

Lastly, although RN Mosley did not reaffirm via testimony other portions of her OIG statement in which Ms. Beck allegedly said "the doctors did not know what they were doing" and "[Ms. Beck's] disposition . . . was as if she had done a heroic act" (DAB R. at 225), Dr. Maeve's independent testimony appears to support a similar sentiment: that Ms. Beck held the doctors in disregard and was proud of her efforts to steer Patient C off a medication that she believed was prolonging his suffering. (See

DAB Tr. Vol. 3 at 7, 18-19 (stating Ms. Beck was "perturbed" that no one had communicated a plan for Patient C's care); at 8 (stating that Ms. Beck referred to the doctors as "fuckers" and then "went on to tell [her] about blah, blah, blah how she told them this and told them this and Dr. Kalla finally agreed"); at 14 (stating that Ms. Beck told her "[Patient C] was on that drip and that it was inappropriate")).

On the other hand, the only evidence in the record that negates any malintent on Ms. Beck's part is her own testimony, which asserts her actions were taken under order, as with the Levophed (see, e.g., DAB Tr. Vol. 1 at 114-18, 126-27, 206), or were otherwise authorized, as with removing Patient C from the ventilator (id. at 178-79). Ms. Beck also vigorously asserted her innocence, and RN Carter emphasized that Ms. Beck "was allowed to leave this country *by [the VAMC]*" to care for other patients notwithstanding this serious charge of intentional harm. (Id. at 217, 219; DAB Tr. Vol. 2 at 76 (emphasis added).)

Even taking into account Ms. Beck's testimony, the weight of the evidence as evinced from the whole record substantially supports the Board's conclusion that Ms. Beck's use of the phrase "angel of mercy" to describe herself, with close temporal references to her discontinuation of Patient C's medication and performance of an "apnea test," indicated that she acted intentionally to hasten Patient C's death.

## 7.  Hearsay Objections

Beyond the specific objections to the Board's use of or citation to the Idaho licensing statute and the VAP protocol,[38] Ms. Beck makes a sweeping assertion that much of the evidence to support the charges against her came in the form of hearsay. (Pl.'s Br. at 18-19; see also Pl.'s Resp. at 4-6.)  She asserts that the OIG investigative report and various interview summaries prepared by SA Scott are unreliable because "[t]his was hearsay about hearsay within hearsay."  (Pl.'s Resp. at 6.) Similarly, she contends that the procedures set forth in the Handbook "do not permit witnesses to present evidence through hearsay or through hearsay documents" and that findings by the Board must be based solely on the "evidence presented," which "strongly implies that the evidence is limited to that 'presented' at the hearing."  (Id. at 5 (emphasis added).)

Ms. Beck offers no authority for her position that hearsay is forbidden in § 7462 proceedings or for her interpretation of the Handbook, which amounts to pointing out an absence of affirmatively permissive language.  Moreover, to the extent the Court can discern, the Board did exactly as she wished.  Only once did the DAB even cite to "testimony given in the OIG report" as evidence supporting the charges against her.  (See DAB R. at 8 (citing RN Mosley's OIG testimony and hearing

---

[38]    The Court addresses these two documents in footnotes 16 and 40, respectively.

testimony).) Otherwise, it made its findings of fact based on Patient C's medical records and the first-hand testimony of twelve nurses, doctors, and administrative personnel involved in the three charges. Thus, Ms. Beck's generalized hearsay objections warrant no further consideration.

In sum, upon examining the record as a whole, the Court cannot find that the Board did not have sufficient evidence to reach its conclusion that Ms. Beck knew or should have known that the discontinuation of Patient C's medication could potentially hasten his death, that removing him from the ventilator in his critical state could do the same, and that in the face of confusion, Ms. Beck should have clarified the plan of care with the physicians on staff. A substantial and rational evidentiary basis exists for the DAB's decision to uphold, in whole or in part, Charges I, II, and III in this case.

### C.    Statutory Due Process

Although unclear from the face of Ms. Beck's complaint, she does not assert that the DAB denied her constitutional due process. (Pl.'s Br. at 12 n.13 ("While Appellant is not arguing that her constitutional rights to due process were denied, she was not given the statutory rights that were specifically set out.").) The complaint instead concludes that "the Agency wrongfully placed [Ms. Beck] on leave without pay" without

"proceeding or other process" when it denied her access to patient care records and failed to "provide[] [her] essential information to formulate her defense" or "proper notice of what she was being accused." (Compl. ¶¶ 11, 13, 15.) In her brief, Ms. Beck clarifies that the VAMC violated the statutory notice provisions by failing to (1) outline the "basis" for each charge filed against her and (2) identify any "specific law, regulation, policy, procedure, practice, or other specific instruction" that she violated. She further alleges that neither the VAMC nor the DAB issued their decisions in a timely manner as required by 38 U.S.C. §§ 7462(b)(3)(A) & (c)(4). Defendant contends that it afforded Ms. Beck adequate notice and the opportunity to be heard, the essential process due under the statute. (Def.'s Br. at 30-32.) The Court addresses each purported violation separately.[39]

### 1. The VAMC Sufficiently Notified Ms. Beck of the Substance of the Charges Against Her.

On June 9, 2011, the VAMC Associate Director for Patient and Nursing Services, RN Cox-Henley, wrote Ms. Beck a "Proposed Removal Memorandum" that apprised her of three charges related

---

[39] To the extent Ms. Beck's complaint could be construed to assert a procedural due process claim based on the VAMC's purported failure to timely *initiate* the disciplinary action against her — an issue that arose frequently in the hearing before the DAB — she abandoned it. She neither raised the issue in her motion for summary judgment nor responded to Defendant's specific argument in its motion for summary judgment on the same. The same is true for any claim arising from the VAMC's purported failure to report as a "sentinel event" the death of Patient C. (Compl. ¶ 14.)

to Patient C's care in the CCU from September 12 to September 15, 2008. (DAB R. at 104-06.) Accompanying each charge is a paragraph-long narrative describing in more detail the offending incidents or actions, all of which generally relate to the discontinuation of Patient C's medication on September 15 and removal of Patient C from the ventilator during an "apnea test" on the same day. (Id.)

Ms. Beck's position appears to be that none of the three charges constitute a "basis" for disciplinary proceedings because the VAMC did not ground each charge in a violation of a specific law or official regulation, policy, procedure, or practice. (See Pl.'s Br. at 12-15.) She claims that the DAB "ultimately went outside the charge as disclosed in the notice to find a 'basis.'"[40] (Id. at 13.) Ms. Beck's second contention

---

[40]     Ms. Beck seems to confuse the VAMC's duty to disclose a "basis" for each charge with the DAB's duty to cite to evidence presented during the hearing in support of its decision to sustain each charge. Ms. Beck complains that certain evidence cited by the DAB in its discharge notice was not disclosed to her as a "basis" for the original charges filed by the VAMC. For example, in sustaining the charge that Ms. Beck endangered Patient C's safety when she removed him from the ventilator, the DAB made reference to the entry on Patient C's flowchart that reflected his oxygenation dropped to 85 percent. (DAB R. at 8.) Ms. Beck states, "There was no reference to this as a basis for this charge in the notice provided," and "[h]ad this charge been fully made, . . . [Ms. Beck] would have had the opportunity to be more emphatic about what the entry meant." (Pl.'s Br. at 15 & n.15.) Similarly, Ms. Beck complains that the DAB referenced the VAP protocol and its own "clinical experience" in sustaining the second specification of Charge I and these were "not referred to in the original charge as a basis." (Id. at 13-14.)

         The Court's response is threefold. First, the VAMC provided Ms. Beck access to all the evidence on which it based the proposed removal, and it appears that she took advantage of that opportunity on June 10, 2011. (DAB R. at 92, 102.) Undoubtedly, it would be ideal for recommending officials to supplement their notices of proposed disciplinary action with ample and clear citations, especially in complex cases like this one with an immense record and numerous players. But there is no statute or regulation that requires

concerning the proposed removal memorandum appears to be that the charges are vague and failed to adequately apprise her of the violative conduct. (See Pl.'s Br. at 12; Compl. ¶ 15.) According to Ms. Beck, the statute requires the recommending official to "make specific references to the record." (Pl.'s Resp. at 7.)

38 U.S.C. § 7462(b)(1)(A) mandates that the charging official send advance written notice to the affected employee "specifically stating the basis for each charge, the adverse actions that could be taken if the charges are sustained, and a statement of any specific law, regulation, policy, procedure, practice, or other specific instruction that has been violated with respect to each charge."

---

such specificity from Defendant and the mandates of Due Process do not require it either. See Gilbert, 419 F. Supp. at 874-78. Second, the VAMC did not charge Ms. Beck with violating the VAP protocol. Instead, to determine whether Ms. Beck exceeded the scope of her practice, the DAB first had to ascertain what test she actually performed and whether she was allowed to perform it given the discrepancies throughout the testimony and OIG investigation. It considered a range of activities that nurses and physicians conduct with respect to ventilated patients and what policies or protocols apply to those activities. Thus, the VAP protocol merely was one among many means of demonstrating that she exceeded the scope of her authority in removing Patient C from the ventilator. Moreover, to the extent Ms. Beck argues the VAP protocol is hearsay, "[i]t is well-settled . . . that hearsay can be considered by an administrative agency," EchoStar Commc'ns Corp. V. F.C.C., 292 F.3d 749, 754 (D.C. Cir. 2002), and in any case, a policy document like the VAP protocol likely would be admissible as a "business record" under Federal Rule of Evidence 803(6) based on precedent in this Circuit. See Weatherly v. Ala. State Univ., No. 2:10-cv-192-WHA, 2012 WL 274654, at *8 (M.D. Ala. Jan. 31, 2012). Third, the Board's "clinical expertise" also was not a "reason" for charging Ms. Beck in the first place. Section 7462 appeals essentially are a peer review process. Members of the panel, as peers *and* subject matter experts, rely on their experience in the medical field to judge incidents that result in a major adverse action. The Under Secretary provided Ms. Beck the names and qualifications of her panel months before her hearing. If she wished to challenge their qualifications to review her case, she could have done so.

First, the plain language of the statute does not support Ms. Beck's contention that "[t]here were no recitations of the basis for each charge" in her proposed removal memorandum. (Pl.'s Mot. Summ. J., Doc. 30, at 1.) "Basis" merely means "a reason," "an underlying fact or condition," or a "foundation or starting point." BLACK'S LAW DICTIONARY 180 (10th ed. 2009); MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary (last visited January 14, 2015). The VAMC provided three overarching "reasons," each with a summary of underlying facts, for bringing the charges against Ms. Beck. (DAB R. at 104-05.)

Review of the corresponding Handbook provisions supports the Court's conclusion. According to these provisions, the advance notice of proposed disciplinary action must contain (1) "[a] statement of the specific charges upon which the proposed action is based" — the "basis" *and* (2) "[a] statement of any specific law, regulation, policy, procedure, practice, or other specific instruction (national, local, or otherwise) that has been violated as it pertains to the charge(s) (*if applicable*)." See VA HANDBOOK 5021, PART II, CH. 1, § 5(b)(2)(b) & (c) (Apr. 15, 2002) (emphasis added).

In both Charges I and II, the VAMC identified the *applicable* "specific instruction[s]" that Ms. Beck purportedly violated — the orders issued by Dr. Kalla and Dr. Degani as to Patient C's medication. (DAB R. at 104.) Defendant contends

that "[t]he removal proposal did not cite other 'specific laws, regulations, policies, or practices' . . . because it did not allege that any had been violated — that is, no such sources were 'applicable.'" (Def.'s Resp., Doc. 45, at 11.) The Court agrees. The gist of the remaining charges against Ms. Beck is that she did not have the authority *as a nurse* to take the actions she did *in the absence of orders* and those actions endangered the life of a patient. The Court can imagine few sources of law or policy that would comprehensively spell out in black letter the principle of "do no harm" or the division of labor between physicians and nurses, and if they do exist, Ms. Beck's testimony reflects that she likely is aware of them given her experience.[41] See Kreso, 2014 WL 4436418, at *4 (noting that the lack of written policies alone will not undermine well supported conclusions by the DAB that an employee was told about the applicable policies and was aware of those policies).

Second, the Court has examined the proposed removal memorandum and found the charges to be stated in a sufficiently clear way as to enable Ms. Beck to defend herself. RN Cox-Henley identified for Ms. Beck's benefit the patient's name; the

---

[41] See DAB Tr. Vol. 1 at 36 (Beck stating that "[a]n apnea test is not in the scope of practice of a registered nurse"); 55 (Beck acknowledging that she "can't diagnose" because she is not a physician); 64-65, 68-69 (Beck acknowledging that registered nurses do not have the authority to dispense medicine in a way contrary to what has been ordered by a physician); 204 (Beck stating that her job is "to assess and tell," but at the very end of the day, . . . it's still on the physician to make the final determination"); see also Pl.'s Br. at 21 ("The only person with sufficient credentials to render an opinion on the patient's condition at all was Dr. Kalla.")

dates on which Ms. Beck cared for the patient; the doctor and night nurse with whom Ms. Beck coordinated the patient's care; the names of the two intravenous medications at issue; the name of, conduct involved in, and witness to the ventilator procedure at issue; and the instructions or orders allegedly not followed, including the dates on which Dr. Degani and Dr. Kalla issued those orders. The proposed removal memorandum further referenced Patient C's medical records as one of its sources and apprised Ms. Beck of her right to review those records and all other evidence. To find that such notice did not contain sufficient information to enable Ms. Beck to fully understand the charges and to respond to them would exact from the VAMC "a higher degree of specificity in drafting . . . than would be required in a Grand Jury's bill of indictment in a criminal matter." See Gilbert, 419 F. Supp. at 870. The Court declines to impart such a burden here, especially given the VAMC's apparent compliance with its own regulations. See VA HANDBOOK 5021, PART II, CH. 1, § 5(b)(2)(b) (Apr. 15, 2002) (mandating that the notice include "names, dates, places, and other data sufficient to enable the employee to fully understand the charges and to respond to them"). Moreover, the Court finds no authority — and Ms. Beck provides none — to support her conclusion that the language of 38 USC § 7462(b)(1)(A) requires

recommending officials to make specific citations to the record in removal memoranda.

Thus, the proposed removal memorandum is amply specific and comports with the due process requirements spelled out in 38 U.S.C. § 7462(b)(1)(A) and the applicable VA Regulations.

### 2. **Ms. Beck Waived Her Claims of Procedural Untimeliness.**

#### a. *The VAMC's Discharge Decision and 21-day Deadline.*

As previously described, the VAMC first notified Ms. Beck of the proposed charges on June 9, 2011. After being granted an extension of fourteen business days to prepare and deliver her response, Ms. Beck missed the new July 7, 2011 deadline. Nevertheless, Mr. Rose met with Ms. Beck and her counsel on July 21, 2011 to discuss the proposed charges. He then issued the discharge decision sustaining all charges on August 24, 2011. The statute mandates that the deciding official "shall render a decision in writing within 21 days of receipt by the deciding official of the employee's answer." 38 U.S.C. § 7462(b)(3)(A). Mr. Rose's decision was not issued within that timeframe, but rather 13 calendar days later.

Notwithstanding the irony of Ms. Beck's allegations of procedural untimeliness by the VAMC given her own failure to adhere to the claim-processing deadlines in the first phase of the disciplinary process, the Court finds that Ms. Beck waived

any such claim by failing to allege it in her complaint. Ms. Beck responds, without any authority, that Defendant "waived its right[] to more fully develop whatever lingering questions it might have had with respect to this allegation" and "waived any objections it [had] to more specific pleadings" because the "parties agreed to proceed with cross motions for summary judgment based on the record of the proceedings at the administrative level." (Pl.'s Reply, Doc. 49, at 2.)

Ms. Beck, however, did not complain at the administrative level that the VAMC committed a procedural due process violation in issuing its discharge decision thirteen days late. Indeed, the sole allegation of procedural untimeliness presented to the DAB was the VAMC's initiation of disciplinary proceedings against Ms. Beck nearly three years after Patient C's death. (See DAB R. at 22 ¶ 2 ("[G]iven the incomplete records provided to Respondent, *in combination with the unusually long delay between accusation and convening of this disciplinary board*, Respondent respectfully requests that this matter be dismissed as fundamentally unfair.") (emphasis added); see also DAB Tr. Vol. 2 at 189-90, 192-96, 233; DAB Tr. Vol. 3 at 177.)

Ms. Beck's complaint, therefore, provided no notice whatsoever that she believed she was entitled to relief *because of the VAMC's untimeliness* in issuing its discharge decision. The procedural history section of the complaint, labeled

"Administrative Course and Proceedings," merely identifies the dates on which (1) the VAMC issued the proposed discharge and discharge decision, (2) the DAB convened and the record closed, and (3) Ms. Beck received the decision from the DAB upholding her removal from federal service. (Compl. ¶¶ 6-8.) Later, in a prayer for relief, Ms. Beck avers that she is "entitled to a full dismissal of the charges against her due to the fundamental due process violations itemized above." (Id. ¶ 15.) Nearly every other paragraph in the complaint addresses the sufficiency of the evidence or the failure of the VAMC and DAB to provide Ms. Beck "essential information," not that any delay caused Ms. Beck any harm.

The Court is not inclined to construe Ms. Beck's complaint so liberally, especially since counsel has represented her throughout these and the underlying administrative proceedings. Indeed, "[t]he court is under no duty to exercise imagination and conjure what a plaintiff might have alleged, but did not, and do counsel's work for him or her. It is enough to view the basic complaint." Argo v. Gregory, No. CV 212-213, 2014 WL 4467268, at *11 (S.D. Ga. Sept. 10, 2014) reconsideration denied, No. CV 212-213, 2014 WL 6683259 (S.D. Ga. Nov. 25, 2014) (citing Pinto v. Universidad De Puerto Rico, 895 F.2d 18, 19 (1st Cir. 1990)). Seeking statutory due process relief at this stage for the VAMC's thirteen-day delay affects a fundamental

change in the nature of Ms. Beck's claims, and she is not entitled to raise it in the midst of summary judgment. See Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006).

In any case, 38 U.S.C. § 7462 provides no remedy in the event a decision and the execution of that decision is delayed. Claasen, 33 F. Supp. 2d at 518. Ms. Beck also did not allege in the complaint or argue in her briefs about harm or prejudice on account of the delay. The law Ms. Beck cites to support her position that the Court "must treat these deadlines as mandatory and it must reverse the disciplinary process" because of the delay is inapposite, incoherent, and in some instances self-contradictory.[42] (See Pl.'s Br. at 16-17 (citing no authority);

---

[42] Ms. Beck first contends that the 21- and 45-day statutory deadlines "are jurisdictional time limits" that cannot be waived, but proceeds to cite case law in which the Supreme Court finds filing deadlines, even those couched in mandatory terms like "shall," are not jurisdictional. (Pl.'s Reply at 3 (citing Sebelius v. Auburn Reg'l Med. Ctr, 133 S. Ct. 817 (2012).) She then contends that if the statutory deadlines are "subject to waiver," "courts are not empowered to forgive or waive deadlines set by statute." (Id. (citing Monzo v. Dep't of Transp., FAA, 735 F.2d 1335 (Fed. Cir. 1984).) Next, she argues that "[w]hen the shoe is on the other foot and a citizen is seeking to raise waiver of a statutory deadline . . . , the courts have been very exacting." (Id. at 3-4 (citing Zimmerman v. Office of Pers. Mgmt., 80 M.S.P.R. 512, 515 (1999).) In the end, she additionally invokes the doctrine of equitable tolling (id. at 4 n.2 (citing Lozano v. Montoya Alvarez, 134 S. Ct. 1224 (2014)) and statutes of limitation (id. at 5 (citing Burnett v. New York Cent. R.R. Co., 380 U.S. 424, 428 (1965)).

Notably, this authority and corresponding legal argument, if applicable at all, appear for the first time in her reply brief, and thus come too late. See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 683 (11th Cir. 2014); Big Top Koolers, Inc. v. Circus-Man Snacks, Inc., 528 F.3d 839, 844 (11th Cir. 2008) ("We decline to address an argument advanced by an appellant for the first time in a reply brief."); Timson v. Sampson, 518 F.3d 870, 874 (11th Cir. 2008) ("[W]e do not address arguments raised for the first time [even] in a pro se litigant's reply brief."); United States v. Coy, 19 F.3d 629, 632 n.7 (11th Cir. 1994) ("Arguments raised for the first time in a reply brief are not properly before a reviewing court.").

Pl.'s Resp. at 7 (citing no authority); Pl.'s Reply at 2-5.)
Notwithstanding the Court's finding that Ms. Beck waived her
claim of procedural untimeliness as against the VAMC, the VAMC's
short delay in issuing its discharge decision would be harmless
error and scarcely can be characterized as having impinged upon
Ms. Beck's fundamental due process rights to obtain information,
to be heard, and to be represented by counsel.

### b. *The DAB's Decision and 45-day Deadline.*

The DAB closed the record of its hearing on February 10,
2012. (DAB R. at 5.) Despite bold assurances to the contrary,[43]
the DAB did not finalize and submit its decision to the Under
Secretary until May 15, 2012. (DAB R. at 10.) The statute
mandates that the DAB must "render a decision within 45 days of
completion of the hearing." 38 U.S.C. § 7462(c)(4). The DAB's
decision was not issued within that timeframe, but rather took
95 calendar days.

As with the VAMC's delay, the face of Ms. Beck's complaint
takes no issue with the DAB's dilatory issuance of its decision,
and the only particularized argument that Ms. Beck suffered harm
on account of the delay appears in her reply brief: she
continued to lack "certainty about the loss of her job." (Pl.'s
Reply at 5.) The Court does not trivialize Ms. Beck's anxiety,

---

[43] "We will be very timely. As a matter of fact, it is our intent because
we're finishing early that we probably will have our initial draft awaiting,
the transcript ready by the time we get on the planes tomorrow." (DAB Tr.
Vol. 3 at 131.)

nor does it condone the DAB's unexplained holdup. But there is simply nothing in the record raising "substantial doubt" that the DAB would have reached a different result if it quickly (and timely) issued its written decision. See Ala. Hosp. Ass'n, 702 F.2d at 958 n.8. Thus, for the same reasons outlined in Part III.C.2.a, the Court finds that the DAB's fifty-day delay in finalizing its decision was harmless error and did not violate Ms. Beck's fundamental due process rights.

## IV. CONCLUSION

For the reasons expressed herein, the Court holds that the DAB's findings and conclusions are not arbitrary or capricious, were obtained with procedures required by law, and were supported by substantial evidence. Although the delay in initiating this action against Ms. Beck is regrettable, the articulated charges amply advised her of the cause of her termination, as well as the names of the witnesses involved, relevant dates, times, medications, therapies, statements purportedly made by Ms. Beck, and orders purportedly issued by the physicians at hand. Ms. Beck had the opportunity to and was in no way restricted from retaining counsel, inspecting the evidence file at her place of work, speaking to witnesses, or presenting a response.[44]

---

[44] Despite the challenges Ms. Beck appears to have had in contacting VAMC officials via telephone, she admits there was nothing preventing her from going through the charges and proposed removal with Mr. Rose during their

81

Ms. Beck was afforded a full-scale evidentiary hearing in which all witnesses were subject to cross-examination and over which a panel of her peers presided. The evidence before the Board included the testimony of twelve live witnesses, thirteen memoranda detailing interviews given by many of the same personnel to the OIG during 2008, as well as Patient C's medical records in electronic *and* chart form. Based on all of the evidence before it, the Board made proper factual determinations that Ms. Beck's actions were neither indicated for Patient C nor authorized by order or practice, and therefore should not have been taken. The Court appreciates the challenging situations in which critical care nurses often find themselves and, of course, it is always easier to review a stressful situation with the benefit of hindsight. But this Court is not in a position to second-guess the DAB's determinations. Based on those determinations, the Board imposed the penalty of discharge. Applying the deferential standard of 38 U.S.C. § 7462, this decision of the DAB must be upheld.

July 21, 2011 meeting. (DAB Tr. Vol. 1 at 212-13, 216.) Rather, she chose not to do so because "he was not who was making the decisions. That's not who we were going to talk to." (Id.) Furthermore, she failed to establish that the VAMC "never . . . provided essential information to formulate her defense." (Compl. ¶ 15.) She made no argument that the VAMC denied her access to the evidence file, only that the file did not contain every document that would be useful to her. The VAMC — and later the DAB — found that Ms. Beck had been provided all of the information to which she was entitled. (See DAB R. at 34, 92.) Nothing in the record indicates that this finding was arbitrary and capricious. Ms. Beck also made no showing that having "some documents" (DAB Tr. Vol. 1 at 212), "some information" (id. at 213), "charts" (id. at 217, 218), "data" (id. at 217), or "the records" (id. at 219) would have permitted her to present a stronger response to Mr. Rose. Accordingly, the VAMC's failure to provide such non-specific categories of documents was harmless error, if error at all.

The Court thus **GRANTS** Defendant's Motion for Summary Judgment (Doc. 30) and **AFFIRMS**, under 38 U.S.C. § 7462, the final decision of the Disciplinary Appeals Board, as approved by the Principal Deputy Under Secretary for Health. Plaintiff Maryetta Beck's Motion for Summary Judgment is **DENIED** (doc. 30) and Defendant's Motion to Strike (doc. 35) is **DENIED AS MOOT**. The Clerk **SHALL ENTER** judgment in favor of Defendant on all claims for relief and **CLOSE** this case.

ORDER ENTERED at Augusta, Georgia, this *16th* day of March, 2015.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA